1

2

3

4

5

6

7

8    # UNITED STATES DISTRICT COURT

9    ## EASTERN DISTRICT OF CALIFORNIA

10

11   | ADALBERTO MACIAS GOMEZ, | Case No. 1:18-cv-00642-DAD-SAB-HC |
     |---|---|
12   | Petitioner, | FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |
13   | v. | |
14   | CALIFORNIA, | |
15   | Respondent. | |

16

17   Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19   ## I.

20   ## BACKGROUND

21   On April 17, 2015, Petitioner was convicted after a jury trial in the Tulare County

22   Superior Court of: twelve counts of committing forcible lewd acts upon a child under fourteen

23   years old; one count of aggravated sexual assault of a child under fourteen years old involving

24   sodomy; four counts of committing lewd acts on a child under fourteen or fifteen years old; and

25   one count of forcible sodomy on a minor aged fourteen years or older. (1 CT[1] 237–54). Petitioner

26   was sentenced to a determinate imprisonment term of 109 years plus an indeterminate term of

27   _____

28   [1] "CT" refers to the Clerk's Transcript on Appeal electronically lodged by Respondent on August 23, 2018. (ECF No. 13).

fifteen years to life. (2 CT 359–63). On August 31, 2017, the California Court of Appeal, Fifth

Appellate District remanded the matter for the trial court to strike a restitution fine and correct

clerical errors in the abstract of judgment, but otherwise affirmed the judgment. People v.

Gomez, No. F072439, 2017 WL 3754320, at *27 (Cal. Ct. App. Aug. 31, 2017). On December

13, 2017, the California Supreme Court denied Petitioner's petition for review. (LDs[2] 5, 6).

On May 11, 2018, Petitioner filed the instant federal petition for writ of habeas corpus.

(ECF No. 1). Therein, Petitioner raises the following claims for relief: (1) erroneous admission

of Petitioner's statement to detectives due to defective Miranda admonition; (2) ineffective

assistance of counsel; (3) erroneous exclusion of evidence of witness's financial motive to

fabricate or exaggerate testimony; (4) instructional errors; (5) prosecutorial misconduct; and (6)

erroneous deprivation of right to discharge appointed counsel.[3] Respondent filed an answer.

(ECF No. 11).

## II.

## STATEMENT OF FACTS[4]

Defendant lived with his girlfriend, Claudia L., their mutual children, and A.C., Claudia's daughter from a previous relationship. Claudia had lived with defendant since 2004 or 2005. In 2007, they moved into a house purchased by defendant.

Defendant began molesting A.C. when she was 10 years old. He touched her over her clothes. Defendant touched her on her breasts, legs, and buttocks, both over and under of her clothing. Defendant started touching A.C.'s buttocks under her clothing when she was 11 years old. Defendant did this more than two times when A.C. was between the ages of 11 and 13 years old. Defendant touched A.C.'s buttocks more than two times when she was 14 years old. When A.C. was between the ages of 11 and 13 years old, defendant touched her breasts five times both over and inside her clothing. Most of the time when defendant touched her, A.C. would tell him no and try to walk away. Defendant would grab her hand and pull her back.

Defendant touched A.C.'s breasts a lot after she was 14 years old. When defendant touched A.C.'s buttocks, she would tell him no. Defendant displayed his penis to A.C. when she was 12 or 13 years old.

When A.C. was between 11 and 13 years old, defendant more than twice took her hand and placed it on his penis. After A.C. turned 14, defendant had her touch his

[2] "LD" refers to the documents electronically lodged by Respondent on August 23, 2018. (ECF No. 13).
[3] It appears that Petitioner is asserting all seven claims that were raised on direct appeal to the California Court of Appeal, Fifth Appellate District. (ECF No. 1 at 5; ECF No. 11 at 18 n.5).
[4] The Court relies on the California Court of Appeal's August 31, 2017 opinion for this summary of the facts of the crime. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

2

penis four or five times. Sometimes, defendant moved A.C.'s hand on his penis, other times she moved it on her own. Defendant also touched A.C.'s vaginal area both over and under of her clothing more than two times from the time she was in fifth grade until after she turned 14. Starting when A.C. was 9 or 10, defendant would put his finger in her buttocks.

When A.C. was 13 years old, defendant put his penis into her buttocks more than four times. Defendant took A.C. to the living room, pulled her pants down, bent her over, and insert his penis into her buttocks. A.C. described the pain she felt as five or six on a scale of one to ten. When defendant was done, A.C. could feel his ejaculation. On one occasion, after he had forced A.C. to have anal sex with him when she was in fourth or fifth grade, defendant told A.C. he thought she was pregnant, and he made her drink something like a chocolate drink.

On multiple occasions, defendant kissed A.C. on her mouth, breasts, neck, arms, and buttocks. When A.C. was 12 or 13 years old, defendant tried to convince her to perform oral sex on him. Defendant told A.C. that if she sucked his penis, he would take her and the other children to the park. Whenever A.C. told defendant no, he got mad at her and would not accept her refusal. Defendant made her perform oral sex on him at least four times, maybe more than five times, before she turned 14 and more than five times after she turned 14.

Defendant told A.C. she would go to jail if she disclosed the molestation when he first began touching her. When A.C. told defendant she was going to tell her mother about the molestation, defendant again told her she would go to jail if she told anyone. Describing defendant's threat that A.C. would go to jail, she said, "he would always tell me that." A.C. was afraid of defendant. He would threaten to hit her when she refused to perform sexual acts. Defendant would gesture as if he was going to hit her, though he never actually struck her. Defendant molested A.C. at least once a month, making it difficult for A.C. to remember all of the acts.

Claudia explained that on a number of occasions, defendant would come home and go to A.C.'s room at night. Claudia described one such incident where defendant came home drunk, went straight to A.C.'s room, and stood close to her while she was in bed sleeping. Defendant began to pick up the covers when Claudia said, "What the fuck are you doing?" Claudia described defendant as "acting stupid," claiming he thought he was in the bathroom.

On April 9, 2014, Claudia got up early in the morning for an exercise class she regularly attended. She left the house at about 5:30 a.m., but the class was cancelled, so she went to the bank and returned home about a half an hour early. When Claudia entered the house, she saw defendant running in his underwear from the kitchen to his bedroom. Claudia heard the bedroom door slam, and went to the room to see what defendant was doing. Defendant was in the bed under the blankets.

Claudia went to A.C.'s room and noticed A.C. was very nervous. She asked A.C. what was going on, and A.C. looked at the floor and said nothing was going on. A.C. would not look at Claudia while speaking to her. Claudia returned to defendant's room to ask him what had happened. He claimed he had heard a noise from the roosters they kept and had gone into the kitchen to check on them.

Claudia went back to talk to A.C., who continued to act strangely. Claudia told A.C. she thought something had happened and she was going to call the police.

A.C. became very scared, burst into tears, and was "crazy crying." A.C. told Claudia she did not want to go to jail. Claudia again asked A.C. what was going on. A.C. reported defendant had been rubbing up against her in the kitchen and touching her legs. Claudia called law enforcement.

Detective Katherine Garcia of the Tulare County Sheriff's Office responded to the call. She contacted A.C., who was extremely emotional, crying, and terrified. Garcia questioned A.C. four times that day.

Claudia's child, A.M., who was 10 at the time of trial, told the police that on the morning defendant was arrested, A.M. saw defendant try to kiss and touch A.C. A.M. saw A.C. push defendant away. A.M. also stated that on a previous occasion, defendant went into his bedroom with A.C. and locked the door. A.M. tried to get into the room, but could not open the door.

Gomez, 2017 WL 3754320, at *2–3.

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of Tulare County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

///

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." Richter, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." Id. at 102.

## IV.

## REVIEW OF CLAIMS

### A.  **Miranda** Violation

Petitioner asserts that the trial court committed prejudicial error by admitting Petitioner's statement to detectives due to a defective Miranda admonition. (ECF No. 1 at 5, 40).[5] Respondent argues that the state court's rejection of this claim was reasonable. (ECF No. 11 at 18). Petitioner raised the defective Miranda admonition claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield v. Cain, 135 S. Ct. 2269, 2276 (2015); Johnson v. Williams, 568 U.S. 289, 297 n.1 (2013); Ylst, 501 U.S. at 806.

In denying Petitioner's claim challenging the adequacy of the Miranda admonition, the California Court of Appeal stated:

---

[5] Page numbers refer to ECF page numbers stamped at the top of the page.

**I. Adequacy of *Miranda* Warnings**

Defendant contends the warnings he received pursuant to *Miranda* were inadequate because he was not expressly advised of his right to counsel before and during the interrogation. Defendant argues the trial court erred in denying his motion to suppress his statements to police and in permitting the jury to hear them. We find the warnings used by investigators adequate and reject defendant's assertion of *Miranda* error.

### A. *Miranda* Advisements

After sheriff's deputies questioned A.C., defendant was taken for questioning. He was questioned in English by Detectives Garcia and Neil Skrinde of the Tulare County Sheriff's Department. At the beginning of the interrogation, defendant was asked if he spoke good English. He replied he understood almost everything but it was hard for him to talk back. Skrinde and Garcia had the following exchange with defendant in which they advised him of his *Miranda* rights:

"[Skrinde:] Okay well we're gonna talk to you and ask you a few questions .... You're not free to leave so we've got to let you know a few things. You've seen cop tv shows and things like that? You watch tv?

"[Defendant:] Yeah.

"[Skrinde:] Yeah? Okay so we gotta do things like read you your rights and make sure that you understand them. It's really not that difficult but we just need to get through it okay? So you have the right to remain silent, anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford an attorney one will be appointed to you at no charge. Won't cost you. You understand those rights? I'm sorry.

"[Defendant:] Yes.

"[Skrinde:] Okay. Alright we're gonna ask you a few questions. This is Detective Garcia, like I told you I'm Neil.

"[Garcia:] If at any time during this interview you don't understand when we're saying something, I can go and grab the Spanish translator from another room in a heartbeat. Okay?

"[Defendant:] Okay.

"[Garcia:] So I want to make sure that you're clear with everything. So you understood everything he just said, is that correct?

"[Defendant:] Yes."

Defendant then began answering questions posed by the detectives.

### B. Analysis

In *Miranda*, *supra*, 384 U.S. at page 479, the United States Supreme Court held that in order to protect an individual's privilege against self-incrimination during custodial interrogation, "the following measures are required. [The individual] must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be

appointed for him prior to any questioning if he so desires.... [U]nless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (*Ibid.*; *People v. Linton* (2013) 56 Cal.4th 1146, 1170–1171.) The United States Supreme Court continues to follow these precepts. (*Florida v. Powell* (2010) 559 U.S. 50, 59–60.)

The warnings need not be given in the exact form set out in *Miranda*. (*Duckworth v. Eagan* (1989) 492 U.S. 195, 202.) The United States Supreme Court "has never indicated that the 'rigidity' of *Miranda* extends to the precise formulation of the warnings given a criminal defendant.... [¶] Quite the contrary, *Miranda* itself indicated that no talismanic incantation was required to satisfy its strictures." (*California v. Prysock* (1981) 453 U.S. 355, 359.) "The prophylactic *Miranda* warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected.' [Citation.] Reviewing courts therefore need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'convey to [a suspect] his rights as required by *Miranda*' " (*Duckworth v. Eagan*, *supra*, at p. 203), including the right to consult with an attorney and to have the attorney with him during questioning (*Florida v. Powell*, *supra*, 559 U.S. at p. 53; *People v. Wash* (1993) 6 Cal.4th 215, 236).

In *People v. Wash*, *supra*, 6 Cal.4th at page 236, the California Supreme Court did not find a *Miranda* advisement inadequate where the defendant was only advised that he had the right to counsel before questioning, but was not told he had the right to counsel during questioning. *Wash* noted the warning "deviated from the standard form in failing to expressly state that defendant had the right to counsel both before and *during* questioning" but found the language used was not so ambiguous or confusing as to lead the defendant to believe counsel would be provided before questioning and summarily removed after questioning began. (*Ibid.*)

One federal case, *Windsor v. United States* (5th Cir. 1968) 389 F.2d 530, 533, held the failure to specifically advise the defendant of the right to counsel during the interrogations themselves rendered the advisement inadequate. The *Miranda* warnings given in *United States v. Wysinger* (7th Cir. 2012) 683 F.3d 784, 803, were found "inadequate and misleading" where "the warning [the agent] gave applied only to 'questioning,' because it erroneously suggested that [the defendant] had to choose between having a lawyer present before questioning or during questioning, and because the agents used various tactics to confuse [the defendant] regarding the start of 'questioning' and divert him from exercising his rights...." No tactics such as those used in *Wysinger* were employed by the investigators here during the custodial interrogation, although *Wysinger* supports defendant's broader point that proper *Miranda* warnings expressly require notice to the defendant of the right to counsel during interrogation.[6]

Defendant further relies on *People v. Lujan* (2001) 92 Cal.App.4th 1389 (*Lujan*). There, the defendant was informed of his right to remain silent, that whatever he said would be used against him in a court of law, and if he did not have the money to afford a lawyer, one would be appointed free of charge. Later, the defendant

---

[6] The parties cite several cases from the federal courts of appeals in support of their argument. We are not bound by these decisions. (*People v. Williams* (2013) 56 Cal.4th 630, 668.) We note, however, that many of the federal authorities cited in our analysis are consistent with our holding there was no violation of *Miranda* here.

told interrogators he had already been interviewed twice, said he thought he needed an attorney, and he asked if he could get one the same day. The investigator told the defendant it was doubtful it because it was Sunday evening. The investigator told the defendant when he went to court in a couple of days there would be an attorney appointed for him because that was the way the system was set up. Lujan asked to make a phone call. A sergeant attempted to place the call for the defendant on the telephone in the interrogation room, but could not make an outside call from that phone. Lujan asked to make a call from a telephone in the jail area and was told he would be moved there. (*Id*. at p. 1398.)

The sergeant then asked the defendant if he wanted to still talk without an attorney present. Lujan initially replied affirmatively, hesitated, and indicated he wanted to wait until after he could make a call. Lujan was escorted to the phones in the booking area. After a few minutes, Lujan indicated he was unable to reach anyone by phone. (*People v. Lujan*, *supra*, 92 Cal.App.4th at p. 1398.) Lujan then indicated he wanted to talk to the detectives and was returned to the interrogation room. Lujan was cajoled by a detective to make a statement. At the same time, unknown to Lujan, an attorney contacted by a family member arrived at the station to contact Lujan but did not make it past the front desk. (*Id*. at p. 1399.)

The court in *Lujan* held the *Miranda* warning was inadequate because the defendant was not informed of his right to appointed counsel before and during the interrogation, and he was misinformed by the investigator that counsel was unavailable on a Sunday evening.[7] (*People v. Lujan*, *supra*, 92 Cal.App.4th at p. 1402.) The decision in *Lujan* is based on facts very distinguishable from these. Not only was the defendant in *Lujan* dissuaded from seeking counsel by his interrogators and cajoled to give a statement, he was misadvised that no attorney would be available to consult with him on a Sunday evening. Defendant here was not told inaccurate information about the availability of counsel and showed no interest before or during his interrogation in having counsel present.

Defendant further relies on *People v. Stewart* (1968) 267 Cal.App.2d 366 which held that a defendant was not given adequate *Miranda* warnings when he was told he could have his attorney present and he did not have to say anything because the statement was too ambiguous, implying counsel could be present at some future time, including after the interrogation was completed. (*Id*. at p. 378.) The People reply *Stewart* relied on the premise that "[t]he burden is on the People to show that the warnings of all the constitutional rights were given ...." (*Ibid*.) The People note, and we agree, this premise is inconsistent with later decisions of the United States Supreme Court holding the inquiry concerning *Miranda* warnings is whether the advisements reasonably convey to a suspect his or her rights as required by *Miranda*. (*Duckworth v. Eagan*, *supra*, 492 U.S. at p. 203, citing *California v. Prysock*, *supra*, 453 U.S. at p. 361.) We decline to follow *Stewart*.

Other cases have taken a different approach to whether the *Miranda* warnings require an express advisement of the right to counsel before and during interrogation. In *United States v. Caldwell* (8th Cir. 1992) 954 F.2d 496, 498, the defendant was told he had the right to remain silent, anything he said could be used against him in a court of law, he had the right to an attorney, and if he could not afford counsel, one would be appointed for him. Caldwell was not informed he had the right to counsel before and during interrogation. (*Id*. at p. 499.) The

---

[7] *Lujan* found the *Miranda* error harmless beyond a reasonable doubt. (*People v. Lujan*, *supra*, 92 Cal.App.4th at pp. 1404–1409.) The defendant obtained federal habeas corpus relief for the *Miranda* violation. (See *Lujan v. Garcia* (9th Cir. 2013) 734 F.3d 917, 932–936.)

court in *Caldwell* noted *California v. Prysock*, *supra*, 453 U.S. at page 360 acknowledged *Miranda* required no talismanic incantation, only the *Miranda* warnings or their equivalent. (*United States v. Caldwell*, *supra*, at pp. 501–502.)

The court in *Caldwell*, relying on *Sweeney v. United States* (9th Cir. 1969) 408 F.2d 121, 124, noted the following about warnings such as those given there and here: "the reference to the right to counsel immediately following the warning as to the right to remain silent and an explanation of the risk in not remaining silent, would 'be taken by most persons to refer to the contemplated interrogation.' " (*United States v. Caldwell*, *supra*, 954 F.2d at p. 503.) The court in *Caldwell* cited other federal authorities in accord with its holding. (*United States v. Lamia* (2d Cir. 1970) 429 F.2d 373, 376–377, cert. den. *sub nom. Lamia v. United States* (1970) 400 U.S. 907; *United States v. Cusumano* (2d Cir. 1970) 429 F.2d 378, 380, cert. den. *sub nom. Riggio v. United States* (1970) 400 U.S. 830; *United States v. Burns* (2d Cir. 1982) 684 F.2d 1066, 1074–1075, cert. den. *sub nom. Burns v. United States* (1983) 459 U.S. 1174.) The warnings that the defendant had the right to remain silent and the right to counsel and to court-appointed counsel are adequate, and failure to specifically inform the defendant of the right to counsel during questioning is not fatal. (*United States v. Adams* (7th Cir. 1973) 484 F.2d 357, 361–363.)

Although the warnings here did not expressly state defendant had the right to consult with an attorney prior to or during questioning, we do not believe the language was so ambiguous or confusing—particularly in light of the stated right to remain silent—as to lead defendant to believe an attorney would not be provided upon request, whenever that request was made. (See *People v. Wash*, *supra*, 6 Cal.4th at p. 236.) The warnings neither suggested any limitation on the right to the presence of counsel nor linked the appointment of counsel to a point in time after police interrogation. (Cf. *Duckworth v. Eagan*, *supra*, 492 U.S. at p. 198; *California v. Prysock*, *supra*, 453 U.S. at pp. 360–361.) The advisements did not " 'entirely omi[t]' ... any information *Miranda* required [the detectives] to impart." (*Florida v. Powell*, *supra*, 559 U.S. at p. 62; see *People v. Lujan*, *supra*, 92 Cal.App.4th at pp. 1397–1403.)

The right to have counsel present before questioning could have been more explicitly stated. The "essential inquiry," however, "is simply whether the warnings reasonably ' "[c]onvey to [a suspect] his rights as required by *Miranda*." ' [Citation.] We are satisfied that the warnings given defendant here 'reasonably conveyed' his right to have an attorney present during questioning." (*People v. Wash*, *supra*, 6 Cal.4th at pp. 236–237, quoting *Duckworth v. Eagan*, *supra*, 492 U.S. at p. 203; see *People v. Lujan*, *supra*, 92 Cal.App.4th at p. 1400; but see *People v. Diaz* (1983) 140 Cal.App.3d 813, 823–824 [warnings found insufficient where Spanish translation to defendant left out right to appointed counsel if defendant could not afford one].)

Defendant has not shown a sufficient defect in the *Miranda* warnings he received prior to the interrogation. The warnings were given to defendant after he had been arrested and placed in a holding cell and immediately after he was told he could not leave the premises. Defendant was expressly told he had the right to an attorney after being advised of his right to remain silent and that anything he said would be used against him in a court of law. In the context of the advisements as a whole, the only reasonable interpretation is that the right to have an attorney existed then and there, during questioning, as did the right to remain silent. Although the right to have counsel available before and during the interrogation

was not expressly stated, it was clearly implicit under the circumstances of defendant's interrogation.

<u>Gomez</u>, 2017 WL 3754320, at *3–7 (footnotes in original).

Before a suspect can be subjected to custodial interrogation, he must be warned "[1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." <u>Miranda v. Arizona</u>, 384 U.S. 436, 479 (1966). "The four warnings <u>Miranda</u> requires are invariable, but [the Supreme Court] has not dictated the words in which the essential information must be conveyed." <u>Florida v. Powell</u>, 559 U.S. 50, 60 (2010). No "talismanic incantation" or "verbatim recital" is required to satisfy <u>Miranda</u>. <u>California v. Prysock</u>, 453 U.S. 355, 359, 360 (1981). "[R]eviewing courts are not required to examine the words employed 'as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably 'conve[y] to [a suspect] his rights as required by <u>Miranda</u>.'" <u>Powell</u>, 559 U.S. at 60 (alterations in original) (quoting <u>Duckworth v. Eagan</u>, 492 U.S. 195, 203 (1989)).

In <u>Florida v. Powell</u>, the Miranda warning at issue consisted of the following:

> You have the right to remain silent. If you give up the right to remain silent, anything you say can be used against you in court. You have the right to talk to a lawyer before answering any of our questions. If you cannot afford to hire a lawyer, one will be appointed for you without cost and before any questioning. You have the right to use any of these rights at any time you want during this interview.

<u>Powell</u>, 559 U.S. at 54 (citations omitted). The question in <u>Powell</u> was whether the warnings satisfied <u>Miranda</u>'s requirement that a suspect held for questioning "must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." <u>Powell</u>, 559 U.S. at 60 (internal quotation marks omitted) (quoting <u>Miranda</u>, 384 U.S. at 471). In holding that <u>Miranda</u> was satisfied, the Supreme Court found that the "officers did not 'entirely omi[t]' any information <u>Miranda</u> required them to impart," and that the admonitions that Powell had "the right to talk to a lawyer before answering any . . . questions" and he had "the right to use any of these rights at any time [he] want[ed] during this interview,"

"reasonably conveyed Powell's right to have an attorney present, not only at the outset of interrogation, but at all times." Powell, 559 U.S. at 62 (citations omitted).

The Ninth Circuit has found that the admonition "you have a right to an attorney" is not sufficient to reasonably convey a suspect's right to the presence of an attorney as required by Miranda, given that circuit precedent "require[s] that officers [affirmatively] convey that the suspect has a right to an attorney prior to and during questioning." United States v. Robbins, 723 F. App'x 471, 472 (9th Cir. 2018) (citing United States v. Noti, 731 F.2d 610, 614–15 (9th Cir. 1984); and United States v. Bland, 908 F.2d 471, 473–74 (9th Cir. 1990)). However, other circuits have found "you have the right to an attorney" without temporal limitation satisfies Miranda. See, e.g., United States v. Nash, 739 F. App'x 762, 764–65 (4th Cir. 2018); United States v. Warren, 642 F.3d 182, 187 (3d Cir. 2011).

Although the warnings in this case "were not the *clearest possible* formulation of Miranda's right-to-counsel advisement," Powell, 559 U.S. at 63, the state court's determination that Petitioner "has not shown a sufficient defect in the Miranda warnings he received prior to the interrogation" was neither contrary to, or an unreasonable application of, clearly established federal law, nor an unreasonable determination of fact. See Kessee v. Mendoza–Powers, 574 F.3d 675, 677 (9th Cir. 2009) ("For purposes of AEDPA review, however, a state court's determination that is consistent with many sister circuits' interpretations of Supreme Court precedent, even if inconsistent with our own view, is unlikely to be 'contrary to, or involve an unreasonable application of, clearly established Federal law, as determined by the Supreme Court.'"); Clark v. Murphy, 331 F.3d 1062, 1071 (9th Cir. 2003) ("The very fact that circuit courts have reached differing results on similar facts leads inevitably to the conclusion that the Arizona court's rejection of Clark's claim was not objectively unreasonable."), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63, 71 (2003). Accordingly, Petitioner is not entitled to habeas relief based on Miranda error, and this claim should be denied.

**B. Ineffective Assistance of Counsel**

Petitioner asserts ineffective assistance of trial counsel for failing to: (1) move to exclude Petitioner's statement to police officers on the ground that it was involuntary; and (2) inform

Petitioner that Petitioner had the right to testify contrary to counsel's advice. (ECF No. 1 at 54, 117). Respondent argues that the state court's rejection of these claims was reasonable. (ECF No. 11 at 23, 51).

1. *Strickland* Legal Standard

The clearly established federal law governing ineffective assistance of counsel claims is Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at 687. First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom.") (citing Strickland, 466 U.S. at 690). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

Second, the petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been different. . . . The likelihood of a different result must be substantial, not just conceivable." Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable. This is different from asking whether defense counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover, because Strickland articulates "a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in order to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods v. Donald, 135 S. Ct. 1372, 1376 (2015) (quoting Burt v. Titlow, 571 U.S. 12, 15 (2013)). When this "doubly deferential" judicial review applies, the inquiry is "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at 105.

  2. Failure to Move to Exclude Confession as Involuntary

Petitioner asserts trial counsel was ineffective for failing to move to exclude Petitioner's statement to detectives on the ground that it was involuntary. (ECF No. 1 at 54). Petitioner raised this ineffective assistance of counsel claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying the ineffective assistance of counsel claim for failure to move to exclude Petitioner's statement as involuntary, the California Court of Appeal stated:

**II. Ineffective Counsel**
Defendant contends his trial counsel was ineffective for failing to argue that his confession was involuntary. Defendant asserts his counsel should have objected to the detectives' use of a "maximization/minimization" technique which, in effect, constituted impermissible threats of punishment if defendant failed to confess and implied promises of leniency if he confessed. The People reply that if defense

counsel had made this argument, the motion would have been meritless. We agree.

### A. Interrogation

During the interrogation, defendant told detectives he did not have sex with A.C. and he knew nothing. Detective Skrinde told defendant A.C. was aware her mother knew about the molestation. Detective Garcia asked defendant if he told A.C. not to say anything to anyone because she would go to jail for the rest of her life. Defendant insisted he did not say this to A.C. Skrinde asked defendant if this was the story he was going to court with, and Garcia added: "That is bullshit because I'll tell you what, no one in a whole freaken world is gonna believe that all these people are gonna make up these lies about you. Nobody."

Several times during the interrogation, the detectives accused defendant of lying. Skrinde told defendant that his child saw defendant in his underwear, taking it off, and the child bolted back into his bedroom. The child also heard defendant as he was trying to get into A.C.'s bedroom. Skrinde said defendant's child was telling the truth before telling defendant: "You on the other hand, you're just a pimp little bitch that won't fucking tell [me] the truth."[8] Skrinde told defendant to get it off his chest and they could work through it. Garcia told defendant she would have more respect for him if he told her the truth, admitted he messed up and did these things, rather than lie to her.

During the interrogation, Skrinde told defendant to tell the truth and let them work with him. Defendant soon told the detectives parts of what they told him about molesting A.C. were true. Garcia told defendant they had talked to everyone in his house and not to make himself look any dumber. Defendant claimed he peed and defecated in A.C.'s bedroom.

Skrinde offered it was possible A.C. was mature for her age, was fully developed with large breasts, and probably "came on" to defendant. Skrinde noted they had talked to A.C.'s friends and A.C. was a fun, outgoing person. Garcia asked defendant if he wanted to be labeled as someone who raped A.C. anally, wondered if they had a relationship A.C. was partially responsible for, and suggested the possibility that A.C. put her hand on defendant's penis to masturbate him. Skrinde wanted to know if A.C. grabbed defendant's "junk" or whether he put her hand on his penis. Defendant denied these scenarios. Skrinde said he and Garcia were starting to wonder if it was more A.C. than defendant, suggesting A.C. was a beautiful, fully developed woman who may have been attracted to defendant, who was not her real dad. Skrinde said to defendant, "You're a man. And that I get. It's happened to me." Skrinde added he wanted to know A.C.'s role in this.

Garcia added this "changes things all the way across the board." Garcia again suggested defendant was forcing A.C. to have anal sex with him, which he denied. Skrinde suggested defendant loved A.C. and thought she loved defendant back. Skrinde wondered if there had been talk of running away together and whether defendant's wife knew about the relationship and was jealous.

Defendant described his wife as angry and difficult with A.C., especially over money. Skrinde told defendant they knew what happened, they were not telling

---

[8] Although the transcript has Skrinde saying defendant "won't fucking tell you the truth," Skrinde clearly says "me," not "you" on the recording of the interrogation. The parties agree this is scrivener's error in the written transcript of the recorded interrogation.

defendant everything A.C. told them, but they knew she came onto defendant in a sexual way. Skrinde explained they knew there was a relationship defendant allowed to go on because "you guys have feelings for each other." Defendant said this was not true, but he did not force A.C. Defendant proceeded to admit having unforced sexual encounters with A.C.

**B. Suppression Motion**

Defendant sought to suppress his confession at a pretrial hearing based on a *Miranda* violation and because his English was poor and he did not understand his rights. He did not argue the confession was involuntary because of the use of the maximization/minimization questioning technique.

In his testimony at the hearing, defendant stated the detectives who questioned him said nothing about an attorney, and he did not know he could have an attorney before questioning. When asked on cross-examination if he was advised of his right to remain silent, defendant said he heard something like that but he did not understand everything. Defendant could not remember the interrogation well. Defendant remembered something about an attorney being appointed for him at no cost if he could not afford to hire one.

Defendant denied being offered a Spanish interpreter and claimed he did not understand what the detectives were talking about. Defendant was aware he was facing serious charges when he talked to the detectives. Defendant then denied he knew how serious the charges were. Defendant denied being able to have a full conversation in English.

The trial court denied defendant's motion to exclude his confession, finding substantial compliance with *Miranda* and rejecting his argument that he failed to understand his rights because of his poor English. The court explained to defense counsel: "I can tell you that your client's testimony in the Court's mind did not help him. I find [defendant]'s testimony is inherently unreliable on several grounds. He says he didn't understand English, he speaks very little English, understands very little English. That's not my impression whatsoever after reviewing Exhibit 1 [the recorded interrogation]. He did say on the tape he speaks English but he understands it better. He was told that if he didn't understand something they would get him an interpreter. Now, he denies that even happened. His denial and his statement that if they offered him an interpreter he would have gotten one, I don't believe that at all."

The court continued: "His testimony is inherently unbelievable on that because the transcript says exactly the opposite.... He is very understandable in English on ... the audiotape. His responses to questions are logical, and they flow. There didn't seem to be any confusion to me in his response to any of these questions. So this ruse about now, in the Court's mind, that he doesn't understand English is exactly that, it's a ruse, and it's trying to use the language barrier to somehow assist him, and it's not going to work in this department. The Court finds that he understands English well, he was able to talk to the officers, and so his statement's coming in."

**C. Voluntary Confession**

A criminal conviction may not be founded upon an involuntary confession. (*Lego v. Twomey* (1972) 404 U.S. 477, 483; *People v. Williams* (2010) 49 Cal.4th 405, 436.) The People bear the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. In making this determination, the question is whether the defendant's choice to confess was not

essentially free because his or her will was overborne. The voluntariness of a confession depends on the totality of the circumstances. We defer to the trial court's findings concerning the circumstances surrounding a confession, but its finding of a voluntary confession is subject to independent review. (*People v. Carrington* (2009) 47 Cal.4th 145, 169.) If the evidence that a confession was coerced conflicts, the version most favorable to the People must be relied upon if supported by the record. (*People v. Tully* (2012) 54 Cal.4th 952, 993.)

No single factor is dispositive in evaluating the voluntariness of a statement, and whether the confession is voluntary depends on the totality of the circumstances. (*People v. Williams*, *supra*, 49 Cal.4th at p. 436; *People v. Williams* (1997) 16 Cal.4th 635, 661.) We view the statement to determine if it is the product of a free and unconstrained choice or whether the defendant's will has been overborne and his or her capacity for self-determination was critically impaired by coercion. (*People v. Williams*, *supra*, at p. 436, citing *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 225.)

Relevant considerations concerning whether an interrogation is coercive include the length of the interrogation, its location, and its continuity, as well as the defendant's maturity, education, physical condition, and mental health. (*People v. Williams*, *supra*, 49 Cal.4th at p. 436, citing *People v. Williams*, *supra*, 16 Cal.4th at p. 660.) In assessing police tactics that are allegedly coercive, courts have only prohibited those psychological ploys which are so coercive they tend to produce a statement that is both involuntary and unreliable under all of the circumstances. (*People v. Williams*, *supra*, 49 Cal.4th at p. 436.)

Investigators are permitted to ask tough questions, exchange information, summarize evidence, outline theories, confront, contradict, and even debate with a suspect. (*People v. Carrington*, *supra*, 47 Cal.4th at p. 170.) They may accuse the suspect of lying (*People v. Enraca* (2012) 53 Cal.4th 735, 755) and urge him or her to tell the truth (*People v. Tully*, *supra*, 54 Cal.4th at p. 994). Investigators can suggest the defendant may not have been the actual perpetrator, or may not have intended a murder victim to die. They can suggest possible explanations of events and offer a defendant the opportunity to provide details of the crime. Absent improper threats or promises, there is no constitutional principle forbidding the suggestion by authorities that it is worse for a defendant to lie in the presence of overwhelming and incriminating evidence. (*People v. Williams*, *supra*, 49 Cal.4th at p. 444.) Deception does not undermine the voluntariness of a defendant's statements to investigators unless it is of a type reasonably likely to procure an untrue statement. (*Id*. at p. 443; *People v. Hensley* (2014) 59 Cal.4th 788, 813.)

A confession is not invalidated simply because the possibility of a death sentence was discussed beforehand, but only where the confession results directly from the threat such punishment will be imposed if the suspect is uncooperative—coupled with a promise of leniency in exchange for cooperation. Suggestions by investigators that killings may have been accidental or resulted from a fit of rage during a drunken blackout fall far short of promises of lenient treatment in exchange for cooperation. This is especially the case where detectives did not represent that the prosecutor or court would grant the defendant any particular benefit if he told them how the killings occurred. (*People v. Holloway* (2004) 33 Cal.4th 96, 116.)

Defendant's minimization argument fails to convince us the detectives interrogated him by improper coercive means. The detectives presented defendant with justifications for his crime, suggesting A.C. may have consented in the

conduct. The detectives told him several times he was lying and asked him to tell the truth. The detectives speculated about the facts of the case and suggested defendant was in love with A.C., that they were in a relationship, and even that she may have initiated some sexual contact. A technique allowing the defendant to share the blame with the victim is permissible and does not render a confession the product of undue psychological coercion. (*People v. Simpson* (1991) 2 Cal.App.4th 228, 233.) The questions and hypotheticals posed did not imply defendant was innocent or suggest there would be no criminal charges against him. (*People v. Holloway*, *supra*, 33 Cal.4th at p. 116.) The detectives conducted permissible questioning. Neither detective made an improper promise or threat to defendant. (*People v. Williams*, *supra*, 49 Cal.4th at p. 444.) The "minimization" by detectives of defendant's conduct included no promise of leniency from the prosecutor or the trial court.

Defendant, who was born in 1977, was 36 years old when he was arrested, indicating maturity. He came to the United States when he was seven years old and lived in Tulare County for 29 years, showing he was not new to the country. Defendant worked as a farm laborer, had one misdemeanor arrest in 2006 for cockfighting, and dropped out of school after completing the eighth grade. Defendant owned a car and was purchasing a home, showing an ability to deal with finances. Defendant's interrogation was an hour and five minutes long and occurred midmorning within a few hours of his arrest. Nothing concerning defendant or the interrogation conditions themselves indicate the interrogation was coercive due to its length, its location, or its continuity, as well as defendant's maturity, education (other than the fact he only completed the eighth grade), physical condition, and mental health. (*People v. Williams*, *supra*, 49 Cal.4th at p. 436.) Nothing in defendant's background or the conditions of the interrogation made it inherently difficult for him to ask for legal counsel or to voluntarily submit to questioning.

Defendant argues that Garcia's reference to him sleeping in a holding cell indicates he was too tired to be questioned. Sheriff's deputies first went to defendant's home about 6:30 a.m. It is unclear when defendant went to the sheriff's substation, but the interrogation began at 10:45 a.m. and lasted just over an hour. The audio recording of the interrogation gives no indication from the tone of defendant's voice that he was sleepy or had any difficulty tracking and understanding the detectives' questions. There are moments during the interrogation when defendant's answers to questions were animated, indicating he was alert. Rather than showing he was exhausted, defendant's rest in the holding cell could indicate instead that he was rested and refreshed prior to being questioned. The record does not objectively support defendant's contention that he was too tired to be questioned without his will being overborne.

In support of his argument, defendant relies in part on a California appellate decision (*In re Elias V.* (2015) 237 Cal.App.4th 568) and two decisions from the Massachusetts Supreme Court (*Commonwealth v. Baye* (2012) 462 Mass. 246 (*Baye*); *Commonwealth v. DiGiambattista* (2004) 442 Mass. 423 (*DiGiambattista*)). *In re Elias V.* is clearly distinguishable factually from this case because the subject of a very aggressive police interrogation was a juvenile only 13 years old who was not at all sophisticated. The victim was very young and did not expressly and clearly describe the juvenile's inappropriate touching. (*In re Elias V.*, *supra*, at pp. 591–594.) Furthermore, the investigating officer failed to question any other witness before aggressively questioning the juvenile with so-called contaminated statements. (*Id.* at pp. 593–594, 597.)

In *DiGiambattista*, the officers used several forms of trickery to induce a confession from the defendant in an arson investigation, including a videotape with a false label and an artificially thick case file prepared in advance to be used for the interrogation to convince the defendant of the ostensible strength of the case against him. More importantly, during the interrogation, officers suggested to the defendant that some form of therapy would be appropriate in his case rather than treating it as a crime. These methods were found to be coercive by the Massachusetts Supreme Court. (*DiGiambattista*, *supra*, 442 Mass. at pp. 434–438.) The court noted the tactic of "minimization" did not by itself compel the conclusion a confession was involuntary. (*Id*. at pp. 438–439.)

The coercion the Massachusetts Supreme Court found in *Baye* included an exaggeration by interrogators of the strength of the evidence against the defendant, simultaneous minimization of the moral and legal gravity of the defendant's alleged crimes and, finally, a suggestion that if the defendant did not confess immediately, he would be charged with crimes more serious than those the investigators thought the defendant was guilty of. Investigators mischaracterized the law to the defendant and dissuaded him from consulting an attorney when he asked for one. The defendant's confession was found involuntary under those circumstances. (*Baye*, *supra*, 462 Mass. at pp. 257–263.)

The coercive techniques employed by investigators in *DiGiambattista* and *Baye* were clearly more numerous and serious than the questions posed by the detectives here.[9] In *DiGiambattista*, investigators expressly suggested during the interrogation that the defendant would be more appropriately served in therapy, negating in the defendant's mind the possibility the matter was still being treated as a crime. In *Baye*, investigators threatened the defendant with more serious charges if he did not immediately confess and further dissuaded him from seeking an attorney after he asked for one. The court in *DiGiambattista* noted the use of minimization was not by itself an impermissible interrogation technique.

The minimization used by the detectives was not employed to suggest to defendant he was innocent of any crime, and there was no mention of leniency. No threats were employed by the detectives to coerce defendant. After Skrinde suggested defendant and A.C. were in a relationship, Garcia stated this could change everything. But rather than implying defendant's innocence, Garcia immediately suggested defendant forced A.C. to have anal sex. This interrogation technique did not minimize defendant's culpability. Defendant initially denied the detectives' suggestion that he had a relationship with A.C. Later, defendant admitted molesting A.C. but denied using force. In summary, defendant has not demonstrated his interrogators used impermissible coercive techniques that overborne his will. Defendant cooperated with the detectives and his conduct was voluntary.

### D. Alleged Ineffective Assistance of Counsel

Defendant contends his counsel was ineffective for failing to challenge his confession as being involuntary. We disagree.

---

[9] Decisions of other jurisdictions are not binding but are persuasive unless they are unsound. (*Acco Contractors, Inc. v. McNamara & Peepe Lumber Co*. (1976) 63 Cal.App.3d 292, 296, citing *People v. Hayne* (1890) 83 Cal. 111, 119; see *People v. Wade* (2016) 63 Cal.4th 137, 141 [analysis of similar statutes by sister state courts persuasive even though legislative history may differ].)

Defendant has the burden of proving ineffective assistance of trial counsel. To prevail on a claim of ineffective assistance of trial counsel, the defendant must establish not only deficient performance, which is performance below an objective standard of reasonableness, but also prejudice. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Williams v. Taylor* (2000) 529 U.S. 362, 391, 394; *In re Hardy* (2007) 41 Cal.4th 977, 1018.) A reasonable probability is one sufficient to undermine confidence in the outcome. The second question is not one of outcome determination but whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. (*In re Hardy*, *supra*, at p. 1018.)

A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Tactical errors are generally not deemed reversible. Counsel's decisionmaking is evaluated in the context of the available facts. To the extent the record fails to disclose why counsel acted or failed to act in the manner challenged, appellate courts will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. Prejudice must be affirmatively proved. The record must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*People v. Maury* (2003) 30 Cal.4th 342, 389.) Attorneys are not expected to engage in tactics or to file motions that are futile. (*Id*. at p. 390; also see *People v. Mendoza* (2000) 24 Cal.4th 130, 166.)

Defendant failed to show his assertion that his confession was involuntary had any legal merit. He therefore has failed to demonstrate prejudice and so his ineffective representation argument fails.

Gomez, 2017 WL 3754320, at *7–12 (footnotes in original).

"Generally, a defendant claiming ineffective assistance of counsel for failure to file a particular motion must not only demonstrate a likelihood of prevailing on the motion, but also a reasonable probability that the granting of the motion would have resulted in a more favorable outcome in the entire case." Styers v. Schriro, 547 F.3d 1026, 1030 n.5 (9th Cir. 2008). Therefore, "the merits of the coercion claim control the resolution of the Strickland claim because trial counsel cannot have been ineffective for failing to raise a meritless objection." Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005).

The Due Process Clause of the Fourteenth Amendment requires confessions to be voluntary in order to be admitted into evidence. Dickerson v. United States, 530 U.S. 428, 433 (2000). The due process voluntariness test "examines 'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession" and "takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the

accused and the details of the interrogation.'" Id. at 434 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). In sum, the voluntariness "determination 'depend[s] upon a weighing of the circumstances of pressure against the power of resistance of the person confessing.'" Dickerson, 530 U.S. at 434 (quoting Stein v. New York, 346 U.S. 156, 185 (1953)).

Here, the California Court of Appeal rejected Petitioner's contention that his confession was involuntary, finding the "minimization" by detectives of Petitioner's conduct (e.g., presenting Petitioner with justifications for his crime and suggesting the victim shared blame in the offense conduct) did not include any promise of leniency from the prosecutor or the court. The state court found that the detectives accusing Petitioner of lying and urging him to tell the truth was permissible. The California Court of Appeal also considered Petitioner's age, education, maturity, and physical condition in addition to the interrogation's length, location, and conditions. Having found that Petitioner's statement was voluntary, the state court then rejected the ineffective assistance of counsel claim because "[a]ttorneys are not expected to engage in tactics or to file motions that are futile." Gomez, 2017 WL 3754320, at *12.

The Supreme Court has recognized that "[t]he line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, difficult to draw." Hayes v. Washington, 373 U.S. 503, 515 (1963). Having reviewed the records before this Court, the Court finds that it was not objectively unreasonable for the state court to determine that, considering the totality of the circumstances, Petitioner's statements were voluntary. See, e.g., United States v. Preston, 751 F.3d 1008, 1026 (9th Cir. 2014) ("Assuredly, interrogating officers can make false representations concerning the crime or the investigation during questioning without always rendering an ensuing confession coerced."); Cunningham v. City of Wenatchee, 345 F.3d 802, 810 (9th Cir. 2003) (officer's repeated insistence that the suspect tell the truth did not amount to coercion); United States v. Wolf, 813 F.2d 970, 975 (9th Cir. 1987) (accusation "of lying does not automatically render the questioning coercive"). The California Court of Appeal also correctly noted that courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," Strickland, 466 U.S. at 689, and that this "presumption has particular force where a petitioner bases his ineffective-

assistance claim solely on the trial record, creating a situation in which a court 'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive,'" Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (quoting Massaro v. United States, 538 U.S. 500, 505 (2003)).

Based on the foregoing, under AEDPA's "doubly deferential" review, Donald, 135 S. Ct. at 1376, the California Court of Appeal's decision rejecting the ineffective assistance of counsel claim for failure to move to exclude Petitioner's statement as involuntary was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief based on ineffective assistance of trial counsel for failing to move to exclude Petitioner's statement as involuntary, and the claim should be denied.

3. Failure to Inform Petitioner of Right to Testify

Petitioner asserts the trial court erred in denying a motion for new trial based on ineffective assistance of trial counsel for failing to inform Petitioner of his right to testify contrary to counsel's advice. (ECF No. 1 at 117). Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying the ineffective assistance of counsel claim for failure to inform Petitioner of his right to testify, the California Court of Appeal stated:

**VIII. Motion for New Trial**
Defendant's public defender filed a motion for new trial, specifically briefing the issue of whether defendant's retained counsel was ineffective for failing to give defendant accurate legal advice concerning the risks of trial and the desirability of a negotiated plea. Defendant executed a declaration stating he believed his retained counsel's representation was ineffective and fell below the constitutional requirement for competent counsel because his speedy trial rights were violated

when defendant overheard the prosecutor state there was difficulty locating a key witness. According to defendant, his retained counsel did not want a speedy trial and told defendant to waive time.

The following comprises defendant's remaining assertions of ineffective assistance of counsel. Defendant claimed he asked his counsel about hiring a nurse, but he was told a nurse was not needed. Defendant asserted his recorded interrogation was used as evidence even though the detective used foul language. Defendant's retained counsel told him his child could not be called as a witness against him. Defendant asked for a plea bargain of 10 to 20 years in prison but counsel said he could not do that. Defendant gave questions for retained counsel to ask the witnesses that were not asked during trial. Defense counsel failed to adequately cross-examine witnesses about potentially inconsistent statements during their preliminary hearing testimony. Defendant wanted to testify at trial but retained counsel told him he could not. And defendant asked to fire his attorney but the judge denied his request.

Defendant contends the trial court erred in denying his motion for a new trial based on ineffective assistance of trial counsel. We find no error.

The defendant has the burden of proving ineffective assistance of trial counsel, and to prevail on a claim of ineffective assistance of trial counsel, the defendant must establish not only deficient performance, which is performance below an objective standard of reasonableness, but also prejudice. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*Williams v. Taylor*, *supra*, 529 U.S. at pp. 391, 394; *In re Hardy*, *supra*, 41 Cal.4th at p. 1018.) A reasonable probability is one sufficient to undermine confidence in the outcome. The second question is not one of outcome determination but whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. (*In re Hardy*, *supra*, at p. 1018.)

A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Tactical errors are generally not deemed reversible. Counsel's decisionmaking is evaluated in the context of the available facts. To the extent the record fails to disclose why counsel acted or failed to act in the manner challenged, appellate courts will affirm the judgment unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation. Prejudice must be affirmatively proved. The record must affirmatively demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. (*People v. Maury*, *supra*, 30 Cal.4th at p. 389.) Attorneys are not expected to engage in tactics or to file motions that are futile. (*Id*. at p. 390; see *People v. Mendoza*, *supra*, 24 Cal.4th at p. 166.)

On direct appeal, reversal of a conviction for ineffective assistance of counsel will only occur if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there could be no satisfactory explanation for counsel's choices. All other claims of ineffective assistance of counsel are more appropriately resolved in a habeas corpus proceeding. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

The allegations of ineffective representation of retained counsel raised in defendant's motion for new trial were raised during the hearing to dismiss

counsel. Defendant's retained counsel explained no expert opinion of a nurse was necessary because the People did not call their own nurse to testify. Counsel explained he did not ask defendant's questions of the prosecution witnesses because the questions would not create any sympathy in the jury for defendant, they were not relevant to the issues in the case, and, as a trial tactic, counsel did not think the questions would help defendant's case. Counsel explained defendant misunderstood the People's pending plea offer, which stood at 32 years. Counsel told defendant he would try to negotiate a term of 10 to 20 years.

Defendant asserted in his motion for new trial that he wanted to testify in his own defense. The trial court had earlier found defendant's testimony during the pretrial suppression hearing to be untrustworthy and untruthful. Defense counsel had a solid and reasonable tactical basis not to ask the questions defendant sought to pose to witnesses and not to have defendant testify. Defendant's assertion that he was not told of a plea bargain of 10 to 20 years was refuted by defense counsel who said the best offer from the prosecutor was 32 years, he tried to negotiate a better offer, and he had communicated the prosecutor's offer to defendant. As for defendant's assertion that defense counsel acquiesced to continuances, the trial court was entitled to reject this assertion, as well as defendant's other assertions, based on defendant's lack of credibility as a witness.

Defendant further contends his original trial counsel told him he could not testify at trial even though he wanted to do so. At the conclusion of defendant's motion to suppress his confession, the trial court found defendant's testimony "inherently unreliable," not convincing, and that defendant's testimony did not help him. Toward the end of trial as counsel were going through jury instructions, the trial court noted to defense counsel it did not intend to give CALCRIM No. 361 on the failure to explain or defend adverse testimony because defendant was not going to testify. Defense counsel replied, "Well, he probably won't." There is no other indication in the record concerning trial counsel's advice to defendant as to whether he should or should not testify. In denying defendant's motion for a new trial, the trial court expressly found that defendant had no credibility with the court.

A trial court has broad discretion in ruling on a motion for new trial. There is a strong presumption it properly exercised its discretion. The determination of a motion for new trial will not be disturbed on appeal unless an unmistakable abuse of discretion occurs. (*People v. Fuiava* (2012) 53 Cal.4th 622, 730.) In making these determinations, the trial court must make its own determinations of witness credibility.[10] (*People v. Carter* (2014) 227 Cal.App.4th 322, 328.) Defendant has failed to demonstrate substandard representation by his retained counsel, prejudice due to counsel's alleged deficient representation, or error in the trial court's ruling on his motion for new trial. Defendant has raised matters, especially concerning his trial counsel's advice concerning whether he could or should testify at trial, that are outside the record and best resolved by a petition for writ of habeas corpus. (*People v. Mai, supra,* 57 Cal.4th at p. 1009.)

<u>Gomez</u>, 2017 WL 3754320, at *23–25 (footnote in original).

---

[10] Defendant argues the trial court improperly relied on its finding made at the conclusion of the pretrial suppression hearing that defendant lacked credibility. Defendant suggests the court should have relied instead on his declaration to reevaluate defendant's credibility. The trial court did not err in relying on the earlier suppression hearing in weighing defendant's credibility. Furthermore, the trial court also had the opportunity to evaluate defendant's credibility during the hearing on defendant's motion to dismiss his attorney. We note that many of the issues raised during that hearing were raised again in the motion for new trial, and the court was entitled to consider retained counsel's statements in weighing defendant's credibility.

25

Here, the California Court of Appeal deferred to the trial court's determination that Petitioner was not credible. See Marshall v. Lonberger, 459 U.S. 422, 434 (1983) ("28 U.S.C. § 2254(d) gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them."). Other than Petitioner's statements, there was nothing in the record regarding defense counsel's motive, strategy, or advice with respect to Petitioner testifying. Courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). The Supreme Court has recognized that this "presumption has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court 'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive.'" Gentry, 540 U.S. at 8 (quoting Massaro, 538 U.S. at 505).

Under AEDPA's "doubly deferential" review of ineffective assistance of counsel claims, Donald, 135 S. Ct. at 1376, the Court finds that the state court's decision denying Petitioner's ineffective assistance claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief based on ineffective assistance of trial counsel for failing to inform Petitioner of his right to testify, and the claim should be denied.

## C. Exclusion of Evidence of Witness's Alleged Motive to Fabricate Testimony

Petitioner asserts that the trial court committed prejudicial error in excluding evidence regarding Claudia's alleged motive to fabricate or exaggerate her testimony. (ECF No. 1 at 68). Respondent argues that this claim is procedurally barred and the state court's denial of this claim was reasonable. (ECF No. 11 at 34). Petitioner raised this claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The

California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's challenge to the exclusion of evidence regarding Claudia's alleged motive to fabricate or exaggerate her testimony, the California Court of Appeal stated:

### III. Exclusion of Evidence of Claudia L.'s Alleged Motive to Fabricate
During cross-examination, defense counsel asked Claudia L. if after the incident she had taken all of the property in the house. The trial court sustained the prosecutor's objection on relevance grounds. Defendant contends the trial court erred in excluding evidence his wife had sole possession of their property after his arrest, which, he claims, gave her a financial motive to fabricate her testimony. Defendant argues the trial court's ruling violated the confrontation clause of the Sixth Amendment, denying him a fair trial. We reject these contentions.

#### A. Preservation of Issue for Appellate Review
If the trial court excludes evidence on cross-examination, no offer of proof is necessary to preserve the issue for consideration on appeal. (Evid. Code, § 354, subd. (c).) An exception to this general rule applies if the evidence the defendant seeks to elicit on cross-examination is not within the scope of direct examination; in that case an offer of proof is necessary to preserve the issue for appellate review. The offer of proof serves to inform the appellate court of the nature of the evidence the trial court refused to receive, creating an adequate record for appellate review. (Evid. Code, § 773; *People v. Foss* (2007) 155 Cal.App.4th 113, 127; *Nienhouse v. Superior Court* (1996) 42 Cal.App.4th 83, 93.)

Defendant relies on Evidence Code section 354, subdivision (c) and further argues the purpose of his question was plainly obvious to the trial court and the prosecutor. The People respond, however, that Claudia was not questioned on direct examination about taking defendant's property. Without an offer of proof, there is no way of discerning how much property Claudia acquired from defendant, if any, or its value. An insufficient value for any property acquired, for instance, would not give Claudia much incentive, if any, to testify falsely against defendant. Because defendant's cross-examination exceeded the scope of the People's direct examination, Evidence Code section 354, subdivision (c) did not excuse him from making a proper offer of proof to the trial court. Defendant has not preserved this issue for appellate review. Alternatively, we reach the merits of defendant's contention and find no error.

#### B. Cross-examination of Claudia L.
Defendant argues it is evident from the question his counsel asked on cross-examination of Claudia that he was trying to establish her financial motive in testifying against him. The question could have potentially created a trial within a trial over what property was owned by defendant separately from Claudia and would not have illuminated her motives in testifying against defendant much more than other inquiries by defense counsel during cross-examination. The trial court did not err in sustaining the People's objection to defense counsel's objection.

Under the confrontation clause, a criminal defendant has the right to cross-examine witnesses concerning their motive to testify. (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678–679.) The confrontation clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defendant desires. (*Id.* at p. 679; *Delaware v. Fensterer* (1985) 474 U.S. 15, 20; *In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1386.) Evidence Code section 352 gives trial courts broad latitude to exclude impeachment evidence in individual cases. (*People v. Smith* (2007) 40 Cal.4th 483, 512.) " 'The statute empowers courts to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues.' " (*Id.* at pp. 512–513; see *People v. Lewis* (2001) 26 Cal.4th 334, 374–375.)

A trial court's exercise of discretion to exclude evidence does not implicate or infringe a defendant's constitutional right to confront a witness against him unless the prohibited cross-examination might reasonably produce a significantly different impression of the witness's credibility (*People v. Cudjo* (1993) 6 Cal.4th 585, 611; *People v. Cooper* (1991) 53 Cal.3d 771, 816–817; *In re Ryan N.*, *supra*, 92 Cal.App.4th at p. 1386.) A trial court's evidentiary rulings, including restrictions on a criminal defendant's cross-examination, may not be overturned on appeal absent a clear showing that the trial court abused its discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717; *People v. Cooper*, *supra*, at pp. 816–817.) The trial court has wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on cross-examination based on concerns of, among other things, harassment, prejudice, confusion of the issues, witness safety, or interrogation that is repetitive or only marginally relevant. (*Delaware v. Van Arsdall*, *supra*, 475 U.S. at pp. 678–679; *People v. Ledesma* (2006) 39 Cal.4th 641, 705; *In re Ryan N.*, *supra*, at pp. 1385–1386.)

The question asked by defense counsel was, at best, marginally relevant to any attempt to discredit the witness. Even an affirmative response to defense counsel's question would only establish she was obtaining unspecified property due to defendant's incarceration. This was tangential to defendant's broader and more important contention that Claudia described their relationship as shaky, unaffectionate, and argumentative. The jury therefore had before it evidence of Claudia's motive to testify against defendant for reasons other than what she witnessed defendant doing. Defendant assumes from little or no evidence in the undeveloped record that Claudia had a strong financial incentive to embellish the People's case against him.

To bolster his claim that Claudia had financial motive to testify against him, defendant argues she had recently quit working as a farm laborer the December prior to the incident and was not married to him. Defendant argues Claudia was not entitled to property under the community property laws and could gain all of defendant's property, giving her a motive to inculpate him. Whether or not Claudia was entitled to property under California's community property laws, she may well have been entitled to property in the home under an express or implied contract theory, equitable claim, or because property was gifted to her. (See *Marvin v. Marvin* (1976) 18 Cal.3d 660, 672–674, 684; *In re Marriage of Melissa* (2012) 212 Cal.App.4th 598, 607.) The trial court had every right to prevent a trial within a trial on the nature and value of the assets owned by Claudia and defendant, which could have caused confusion of the issues and was only

marginally relevant (*People v. Cooper, supra,* 53 Cal.3d at p. 817).[11] Even had defendant made a showing of proof, the trial court would have been justified in sustaining the prosecutor's objection to this line of inquiry to prevent a nitpicking war of attrition over a collateral credibility issue. (*People v. Smith, supra,* 40 Cal.4th at pp. 512–513; see *People v. Lewis, supra,* 26 Cal.4th at pp. 374–375.)

Even assuming Claudia received defendant's property, an appellate court's review of the record is limited to matters contained in the record. The appellant has the burden of furnishing the reviewing court with a sufficient record to consider the issues on appeal. (*People v. Neilson* (2007) 154 Cal.App.4th 1529, 1534.) Rather than meeting this burden and presenting evidence supporting his claim, defendant evades his burden on appeal behind a flurry of speculation.

A restriction on cross-examination only violates the Sixth Amendment when the prohibited testimony might reasonably have produced a significantly different impression of a witness's credibility. (*People v. Cooper, supra,* 53 Cal.3d at p. 817, citing *Delaware v. Van Arsdall, supra,* 475 U.S. at p. 680.) Defense counsel already challenged Claudia's motive to testify against defendant by showing they were in an unhappy relationship. Testimony concerning the property holdings of the couple would not have produced a significantly different impression of Claudia's credibility.

Gomez, 2017 WL 3754320, at *12–14 (footnote in original).

1. Procedural Default

A federal court will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32. However, there are limitations as to when a federal court should invoke procedural default and refuse to review a claim because a petitioner violated a state's procedural rules. Procedural default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989).

To qualify as "independent," a state procedural ground "must not be 'interwoven with the federal law.'" Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v. Long, 463 U.S. 1032, 1040–41 (1983)). "To qualify as an 'adequate' procedural ground, a state

---

[11] Defendant relies on *State v. White* (Mo.Ct.App. 2002) 81 S.W.3d 561 which found a similar line of questioning relevant. In *White,* the mother of an allegedly molested child was in a pending divorce action with the defendant, who learned after his conviction that his wife had been romantically involved with the investigating officer. The suppressed facts would have supported the defense theory the mother assisted and encouraged the molestation allegations even if she did not originate them. (*Id*. at pp. 563–564, 567–570.) The facts in *White* are completely inapposite to those here where there is no allegation the prosecution withheld evidence and no evidence Claudia substantially profited from the criminal allegations against defendant.

rule must be 'firmly established and regularly followed.'" <u>Walker v. Martin</u>, 562 U.S. 307, 316 (2011) (quoting <u>Beard v. Kindler</u>, 558 U.S. 53, 60 (2009)). The Ninth Circuit has taken a burden-shifting approach to determining the adequacy of a state procedural ground. <u>See</u> <u>Bennett</u>, 322 F.3d at 586. First, the respondent must plead an independent and adequate state procedural bar as an affirmative defense. The burden then shifts to the petitioner "to place that defense in issue," and can be satisfied by "asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." <u>Id.</u> If the petitioner satisfies his burden, the burden shifts back to the respondent, which bears "the ultimate burden of proving the adequacy" of the state procedural bar. <u>Id.</u> at 585–86.

In the instant case, Respondent has cited to unpublished decisions of our sister courts that have found California Evidence Code section 354 to be an independent and adequate state procedural ground. (ECF No. 11 at 34–35) (citing <u>Arana v. Grounds</u>, No. 11-cv-01972-JST (PR), 2014 U.S. Dist. LEXIS 3247 (N.D. Cal. Jan. 9, 2014); <u>Williams v. Duffy</u>, No. EDCV 13-0468-JGB (DTB), 2013 U.S. Dist. LEXIS 181484 (C.D. Cal. Oct. 29, 2013); <u>Marshall v. Hedgepeth</u>, No. 2:10-cv-00565-JKS, 2012 U.S. Dist. LEXIS 53354 (E.D. Cal. Apr. 13, 2012)). Petitioner has not raised any challenges to the adequacy of California Evidence Code section 354 and thus, has failed to place the defense in issue. Accordingly, the Court finds that the California Court of Appeal applied an independent and adequate state procedural rule, and Petitioner has procedurally defaulted his claim regarding exclusion of evidence of Claudia's alleged motive to fabricate or exaggerate her testimony

In any case, as set forth below, the Court finds that Petitioner's exclusion of evidence claim is without merit. <u>See</u> <u>Apelt v. Ryan</u>, 878 F.3d 800, 825 (9th Cir. 2017) ("[W]hen a state court 'double-barrels' its decision—holding that a claim was procedurally barred and denying the claim on its merits—both its procedural default ruling and its merits ruling are entitled to deferential review by federal courts, as intended by AEDPA.").

2. <u>Merits Analysis</u>

The Sixth Amendment's Confrontation Clause, made applicable to the states by the Fourteenth Amendment, <u>Pointer v. Texas</u>, 380 U.S. 400, 403 (1965), provides that "[i]n all

criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. "The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*" Davis v. Alaska, 415 U.S. 308, 315 (1974) (quoting 5 J. Wigmore, Evidence § 1395, at 123 (3d ed. 1940)). "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (per curiam). Therefore, although "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination," Davis, 415 U.S. at 316–317, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant," Delaware v. Van Arsdall, 475 U.S. 673, 678–79 (1986). However, "[r]estrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" Michigan v. Lucas, 500 U.S. 145, 151 (1991) (quoting Rock v. Arkansas, 483 U.S. 44, 56 (1987)).

> [A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."

Van Arsdall, 475 U.S. at 680 (quoting Davis, 415 U.S. at 318). Thus, the pertinent question is whether a "reasonable jury might have received a significantly different impression of [the witness]'s credibility had [defense] counsel been permitted to pursue his proposed line of cross-examination." Van Arsdall, 475 U.S. at 680.

On cross-examination, Claudia testified that her relationship with Petitioner at the time of the offense was "[a] little shaky," that they "were not so affectionate with each other," and that they "would argue a lot . . . would fight a lot." (2 RT 92–93). It was not unreasonable for the state court to conclude that given Claudia's testimony on cross-examination regarding the "shaky, unaffectionate, and argumentative" nature of Petitioner and Claudia's relationship, a

reasonable jury would not have received a significantly different impression of Claudia's credibility had defense counsel been permitted to pursue his cross-examination regarding property Claudia may have acquired due to Petitioner's arrest. The state court reasonably concluded that permitting this line of cross-examination would have resulted in a "a trial within a trial on the nature and value of the assets owned by Claudia and defendant, which could have caused confusion of the issues and was only marginally relevant" as a "collateral credibility issue." Gomez, 2017 WL 3754320, at *14 (citation omitted).

Based on the foregoing, the Court finds that the California Court of Appeal's denial of Petitioner's exclusion of evidence claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The state court's determination was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief based on the exclusion of evidence of Claudia's alleged motive to fabricate her testimony, and this claim should be denied.

**D. Instructional Errors**

Petitioner asserts that the trial court erred in failing to instruct sua sponte on the misuse of Child Sexual Abuse Accommodation Syndrome ("CSAAS") testimony and expert testimony. (ECF No. 1 at 86). Respondent argues that the state court's rejection of these claims was reasonable. (ECF No. 11 at 36). Petitioner raised these instructional error claims on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claims in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying the instructional error claims, the California Court of Appeal stated:

**IV. Instructions on CSAAS and Experts**
Defendant contends the trial court prejudicially erred when it failed to provide the jury with a special instruction on CSAAS. Defendant alternatively argues the

court should have instructed the jury with the general instruction on the use of expert testimony pursuant to section 1127b. Defendant did not request a CSAAS instruction. We find there was no general presentation of CSAAS evidence, the testifying detective did not testify as an expert in CSAAS, an instruction for CSAAS testimony is only required where requested, and although there was no expert witness instruction, any error in failing to so instruct the jury was harmless.

**A. Facts**

Detective Garcia testified at trial concerning her training and experience in handling sexual assault investigations in hundreds of cases over eight years. Without objection from defense counsel, Garcia testified that victims of sexual assault all react differently. Victims do not always disclose their abuse immediately. In Garcia's experience, this can happen because the victim feels humiliated, is scared to tell someone what happened, or feels the abuse was the victim's fault. Victims sometimes do not tell the entire story and initially disclose only portions of their testimony.

Garcia was recalled as a witness after A.C. testified. She explained it was "extremely common" for sexual abuse victims not to initially disclose everything that happened to them. Garcia added that for many victims, there are so many incidents of abuse, the victims have trouble remembering each individual incident.

Garcia talked to A.C. three or four times the day A.C. first reported the abuse and once a few weeks later. The day the incident was reported, Garcia talked to A.C. in the morning at 8:30, 9:26, and 9:40, and later after lunch. A.C.'s emotional state while Garcia questioned her was "[e]xtremely embarrassed, emotional, crying, [and it was] very difficult for [Garcia] to even get her to open up ... initially."

**B. CSAAS**

Expert testimony explaining CSAAS is admissible to dispel common misconceptions the jury may have concerning how children react to abuse, but it is inadmissible to prove the child has been abused. CSAAS is a model for understanding the behavior of children who have been sexually abused and to dispel myths that abused children fight back and immediately disclose the abuse. The five components of the model are secrecy, helplessness, accommodation, disclosure, and recantation. Children adopt mechanisms to cope with the trauma of abuse. If the abuser is a family member, it is not unusual for the child to continue to show the abuser affection. Most children delay disclosure, if they disclose at all. When the victim does disclose abuse, there can be problems with memory, and details of the abuse may merge. (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069–1070.)

*Mateo* held the Legislature has determined that limiting instructions, pursuant to Evidence Code[12] section 355, need not be given by trial courts sua sponte. Absent a request, the trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted. (*People v. Mateo, supra*, 243 Cal.App.4th at p. 1071, citing, inter alia, *People v. Murtishaw* (2011) 51 Cal.4th 574, 590; *People v. Cowan* (2010) 50 Cal.4th 401, 479; *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051–1052 [possible narrow exception where the evidence is the

---

[12] In relevant part, Evidence Code section 355 provides: "When evidence is admissible ... for one purpose and is inadmissible ... for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly."

dominant part of the case against the accused and is both highly prejudicial and minimally relevant to any legitimate purpose.].)

The court in *Mateo* further rejected the defendant's reliance on section 1127b[13] as mandating any clarifying instruction on expert testimony after the basic instruction on expert testimony is given. This is so because under the plain language of the last sentence of section 1127b, no further instruction is necessary. (*People v. Mateo*, *supra*, 243 Cal.App.4th at p. 1072.) Although the jury here was not given instructions on expert testimony, as we discuss in more detail below, Detective Garcia's testimony tendered as an expert was limited to her experience as a detective, not as a CSAAS expert, and she did not testify to matters outside her own personal experience.

One authority relied upon by defendant, *People v. Bowker* (1988) 203 Cal.App.3d 385 (*Bowker*), held that where there is expert testimony on CSAAS, the jury must be instructed the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true. (*Id.* at p. 394.) As recently analyzed by *People v. Mateo*, however, it is unclear whether *Bowker* intended to impose a sua sponte duty on the trial court to give the limiting instruction. Defendant also relies on *People v. Housley* (1992) 6 Cal.App.4th 947, which held that where there is CSAAS testimony, a trial court has a sua sponte duty to instruct the jury on how to evaluate it. (*Id.* at pp. 957–959.)

*Mateo* criticized the reasoning of *Housley* and *Bowker* and noted that three cases subsequent to *Bowker* from the same court held the limiting instruction must be given " 'if requested.' " (*People v. Mateo*, *supra*, 243 Cal.App.4th at p. 1073, citing *People v. Stark* (1989) 213 Cal.App.3d 107, 116, *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735, disapproved on other grounds in *People v. Jones* (1990) 51 Cal.3d 294, 307, and *People v. Bothuel* (1988) 205 Cal.App.3d 581, 587–588, disapproved on another point in *People v. Scott* (1994) 9 Cal.4th 331, 347–348.) The court in *Mateo* concluded, "We are confident that *Stark*, *Sanchez*, and *Bothuel* accurately describe the intention of the decision in *Bowker*." (*People v. Mateo*, *supra*, at p. 1073.)

We agree with the People's point that Detective Garcia did not either testify as an expert on CSAAS or make a presentation of CSAAS. Garcia explained that in her personal experience investigating sexual abuse cases over eight years involving hundreds of cases, victims do not react alike, they often do not immediately disclose the abuse or reveal all at once everything that happened, they can fear the disclosure, and they often feel humiliated. The five components of the CSAAS model noted in *Mateo* are secrecy, helplessness, accommodation, disclosure, and recantation. (*People v. Mateo*, *supra*, 243 Cal.App.4th at p. 1069.) The questions Garcia answered from the prosecutor were related to disclosure and, specifically, based on her personal experience, that victims do not necessarily report everything all at once and they can fear disclosure. Garcia did not opine about

---

[13] Section 1127b states:

"When, in any criminal trial or proceeding, the opinion of any expert witness is received in evidence, the court shall instruct the jury substantially as follows:

"Duly qualified experts may give their opinions on questions in controversy at a trial. To assist the jury in deciding such questions, the jury may consider the opinion with the reasons stated therefor, if any, by the expert who gives the opinion. The jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable.

"No further instruction on the subject of opinion evidence need be given."

other aspects of CSAAS such as secrecy, helplessness, accommodation, or recantation.

Had Garcia testified as an expert, covering the full scope of CSAAS, a limiting instruction would still not have been required absent a request from defendant. Garcia's testimony, however, was not that of an CSAAS expert. It was limited to her own personal experience with sexual abuse victims. Garcia did not present CSAAS testimony or provide an expert opinion regarding A.C.'s emotional state other than her personal observations of A.C. Under these circumstances, no CSAAS instruction was necessary and would likely have confused the jury because it would have touched on other CSAAS factors not presented by Garcia or other prosecution witnesses.

### C. Expert Opinion Instruction

Defendant alternatively argues the trial court erred in failing to instruct the jury on how to evaluate expert testimony. Under Evidence Code section 801, subdivision (a), an expert can relate an opinion on a subject that is sufficiently beyond common experience if it would assist the trier of fact.[14] Where a witness testifies as an expert, section 1127b imposes a sua sponte duty on the trial court to instruct the jury on how to evaluate the opinion of the witness. (See fn. 8, *ante*; *People v. Haynes* (1984) 160 Cal.App.3d 1122, 1137; *People v. Lynch* (1971) 14 Cal.App.3d 602, 610.)

Detective Garcia's personal observations of A.C.'s emotional state when she gave her statements was not expert opinion. (*People v. Lynch*, *supra*, 14 Cal.App.3d at p. 609 [medical doctor's testimony of physical condition of victim was not expert opinion and was outside the scope of § 1127b].) Garcia had investigated hundreds of sexual abuse cases for eight years. The People argue these observations were based on Garcia's personal observations and therefore are outside the scope of expert opinion. We disagree with the People's assessment on this second point. Garcia's description of how sexual abuse victims act is outside the common experience of most people other than law enforcement investigators and, although it was neither a psychological evaluation nor CSAAS testimony, it did require Garcia's general expertise as an investigator.

The failure of the trial court to give a section 1127b instruction is not prejudicial unless the reviewing court, after reviewing the entire record, determines a different finding might have been rendered by the jury. (*People v. Williams* (1988) 45 Cal.3d 1268, 1320; *People v. Haynes*, *supra*, 160 Cal.App.3d at p. 1137; *People v. Lynch*, *supra*, 14 Cal.App.3d at p. 610.)

We note Garcia's testimony was not rebutted by defendant or any other witness. Also, the gravamen of Garcia's testimony was that some victims of sexual abuse do not tell the entire story of the abuse they suffered all at once. This was the point the prosecutor was attempting to corroborate through Garcia's testimony.

---

[14] Evidence Code section 801 provides:

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is:

"(a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and

"(b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

A.C. talked to Garcia five times, but four of those questioning sessions occurred the same day A.C. initially reported that defendant abused her. Garcia questioned A.C. in the morning at about 8:30, 9:26, and 9:40, and right after lunch. Garcia questioned A.C. one more time a few weeks later. This was not a case where the victim gave different accounts of what happened over a long span of time. Any details A.C. added from her first conversation with Garcia concerning the abuse she suffered were given within five or six hours on the same day. They were not given in an erratic, piecemeal fashion full of contradictions. Garcia's corroborative testimony that abuse victims often do not tell the entire history of their abuse all at once added little to the evidence before the jury.

To the extent that Garcia's testimony regarding how victims of sexual abuse reveal what happened to them was outside common experience, it was based on Garcia's personal observations of A.C. and of other sexual abuse victims. It was not expert testimony based on complex scientific evidence or other matters far beyond the common knowledge of juries, attorneys, and judges that would require a more careful evaluation of the foundation for an expert's opinion. Furthermore, Garcia's expert testimony as an investigator of sexual abuse cases was couched in general terms, described behavior common to abused victims as a class, and did not refer to specific individual victims, including A.C. Failure to give instructions on CSAAS, or on expert testimony, was harmless. (See *People v. Housley*, *supra*, 6 Cal.App.4th at pp. 958–959.)

Garcia conceded in her testimony that sexual abuse victims experience a range of reactions when they report abuse. On cross-examination, Garcia admitted she conducted investigations where victims lied. Garcia was asked if it was her place to determine whether someone is telling the truth and if that question was ultimately up to the jury. Garcia replied that investigations take their own course and courts determine the outcome of a case.

Garcia's point that courts ultimately determine the outcome of a case was reinforced by the standard instructions given to the jury. The jury was instructed with CALCRIM No. 200 that it must decide what the facts are, and it alone had to decide what happened based on the evidence presented at trial. The jury was further advised with CALCRIM No. 226 that it alone must judge the credibility and believability of the witnesses. The instructions given to the jury clearly advised it to evaluate the credibility of the victim, her mother, Detective Garcia, as well as the other witnesses who testified at trial.

Given the very limited nature of Garcia's testimony as an expert, as well as Garcia's concession that courts determine the outcome of cases, the absence of an instruction on expert testimony was adequately covered by the standard jury instructions on evaluating witness credibility. Any error in failing to give an instruction on expert testimony was harmless. (*People v. Williams*, *supra*, 45 Cal.3d at p. 1320; *People v. Housley*, *supra*, 6 Cal.App.4th at pp. 958–959; *People v. Haynes*, *supra*, 160 Cal.App.3d at p. 1137; *People v. Lynch*, *supra*, 14 Cal.App.3d at p. 610.) We conclude the trial court's failure to give a CSAAS instruction was not error and the absence of an instruction on expert testimony was harmless error.

Gomez, 2017 WL 3754320, at *14–18 (footnotes in original).

///

///

1    1.  Legal Standard

2         "[T]he fact that an instruction was allegedly incorrect under state law is not a basis for

3    [federal] habeas relief." Estelle v. McGuire, 502 U.S. 62, 71–72 (1991). A federal court's inquiry

4    on habeas review is not whether a challenged jury instruction "is undesirable, erroneous, or even

5    'universally condemned,' but [whether] it violated some right which was guaranteed to the

6    defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973). "[N]ot

7    every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due

8    process violation." Middleton v. McNeil, 541 U.S. 433, 437 (2004). The pertinent question is

9    "whether the ailing instruction by itself so infected the entire trial that the resulting conviction

10   violates due process." Cupp, 414 U.S. at 147. "It is well established that the instruction 'may not

11   be judged in artificial isolation,' but must be considered in the context of the instructions as a

12   whole and the trial record." Estelle, 502 U.S. at 72 (quoting Cupp, 414 U.S. at 147). This

13   standard also applies to omitted instructions, Murtishaw v. Woodford, 255 F.3d 926, 971 (9th

14   Cir. 2001), but Petitioner's "burden is especially heavy because no erroneous instruction was

15   given . . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a

16   misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

17        2.  CSAAS Instruction

18        "CSAAS is a model for understanding the behavior of children who have been sexually

19   abused. It dispels the myths that children in abuse situations fight back and immediately disclose

20   the abuse. The model has five components: secrecy, helplessness, accommodation, disclosure,

21   and recantation." People v. Mateo, 243 Cal. App. 4th 1063, 1069 (Cal. At. App. 2016). Here,

22   Detective Garcia did not mention CSAAS or base her testimony on the CSAAS model. She

23   testified based on her personal experience investigating hundreds of sexual abuse cases for eight

24   years and only with respect to one component—disclosure—of the model's five components. (2

25   RT 47–49).

26        The California Court of Appeal's determination that "Detective Garcia did not either

27   testify as an expert on CSAAS or make a presentation of CSAAS" was not an unreasonable

28   determination of the facts. See Hernandez v. Holland, 750 F.3d 843, 857 (9th Cir. 2014) ("A

state court's decision is based on unreasonable determination of the facts under § 2254(d)(2)[15] if the state court's findings are 'unsupported by sufficient evidence,' if the 'process employed by the state court is defective,' or 'if no finding was made by the state court at all.'" (quoting <u>Taylor v. Maddox</u>, 366 F.3d 992, 999 (9th Cir. 2004))). "[U]nder § 2254(d)(2), a federal court 'may not second-guess' a state court's factual findings unless 'the state court was not merely wrong, but actually unreasonable' in light of the record before it." <u>Atwood v. Ryan</u>, 870 F.3d 1033, 1047 (9th Cir. 2017) (quoting <u>Taylor</u>, 366 F.3d at 999). As Detective Garcia did not testify as an expert on CSAAS or even make a presentation of CSAAS, Petitioner has failed to satisfy his "especially heavy" burden, <u>Henderson</u>, 431 U.S. at 155, to demonstrate that the omission of the CSAAS instruction "by itself so infected the entire trial that the resulting conviction violates due process," <u>Cupp</u>, 414 U.S. at 147.

The Court finds that the state court's denial of Petitioner's CSAAS instructional error claim was not contrary to, or an unreasonable application of, clearly established federal law,[16] nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Richter</u>, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on the CSAAS instructional error claim, and it should be denied.

3. <u>Expert Testimony Instruction</u>

Although the jury was not given an expert witness instruction, the trial court did issue the following instruction to the jury about witness credibility and testimony generally:

> It is up to you and you alone to judge the believability of the witnesses. In deciding whether testimony is true and accurate, use your common sense and experience. . . .

---

[15] A different provision of AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The Ninth Circuit's "panel decisions appear to be in a state of confusion as to whether § 2254(d)(2) or (e)(1), or both, applies to AEDPA review of state-court factual findings," <u>Murray v. Schriro</u>, 745 F.3d 984, 1001 (9th Cir. 2014), and the Supreme Court has not addressed the relationship between § 2254(d)(2) and (e)(1), <u>Wood v. Allen</u>, 558 U.S. 290, 300 (2010). However, the Court "need not address the interaction between § 2254(d)(2) and (e)(1) when the petitioner's claims fail to satisfy either provision." <u>Atwood v. Ryan</u>, 870 F.3d 1033, 1047 (9th Cir. 2017) (citing <u>Murray</u>, 745 F.3d at 1001).

[16] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is whether it "reasonably applied the principles contained in relevant Supreme Court precedent." <u>Parker v. Small</u>, 665 F.3d 1143, 1148 n.1 (9th Cir. 2011) (citing <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002)). The Supreme Court has noted that a state court is not required to cite or even be aware of its cases under § 2254(d). <u>Early</u>, 537 U.S. at 8.

You must judge the testimony of each witness by the same standards, setting aside any bias or prejudice you may have. You may believe all, part, or none of any witness's testimony. Consider the testimony of each witness and decide how much of it you believe. In evaluating a witness's testimony, you may consider anything that reasonably tends to prove or disprove the truth or accuracy of that testimony.

Other factors that you may consider are:

How well could the witness see, hear, or otherwise perceive the things about which the witness testified?

How well was the witness able to remember and describe what happened?

What was the witness's behavior while testifying?

Did the witness understand the questions and answer them directly?

Was the witness's testimony influenced by a factor such as bias or prejudice, a personal relationship with someone involved in the case, or a personal interest in how the case is decided?

What was the witness's attitude about the case or about testifying?

Did the witness make a statement in the past that is consistent or inconsistent with his or her testimony?

How reasonable is the testimony when you consider all the other evidence in the case?

Did other evidence prove or disprove any fact about which the witness testified?

Did the witness admit to being untruthful?

Did the witness engage in any other conduct that reflects upon his or her believability?

(3 RT 245–46). The trial court also instructed that it was up to the jury "alone to decide what happened based only on the evidence that has been presented to you in this trial." (3 RT 237).

On direct examination, Detective Garcia described in broad and general terms how sexual abuse victims may act when Detective Garcia meets with them during the course of her investigations. (2 RT 48–49). Detective Garcia acknowledged she had "come across all types of victims" and that there is no certain way a victim acts. (2 RT 48). On cross-examination, Detective Garcia testified that she has "had investigations where victims have lied about things, yes." (2 RT 55). When asked by defense counsel whether it was the detective's place to determine whether someone is telling the truth or if "that's really ultimately up to the jury,"

1  Detective Garcia answered that "[t]he investigation takes its own course and then the court
2  determines." (2 RT 55).

3          Detective Garcia's testimony was based on her personal observations investigating
4  hundreds of sexual abuse cases for eight years, and thus, based on Detective Garcia's general
5  expertise as a law enforcement investigator. (2 RT 47–49). The testimony did not rely on
6  complex scientific evidence or require a highly technical background. Given that Detective
7  Garcia's expert testimony was limited and generalized, and in light of the court's instructions
8  that the jury alone was to judge the credibility of witnesses and decide what happened based only
9  on the evidence, Petitioner has failed to satisfy his "especially heavy" burden, Henderson, 431
10 U.S. at 155, to demonstrate that the omission of the expert witness instruction "by itself so
11 infected the entire trial that the resulting conviction violates due process," Cupp, 414 U.S. at 147.

12         Based on the foregoing, the Court finds that the state court's denial of Petitioner's expert
13 witness instructional error claim was not contrary to, or an unreasonable application of, clearly
14 established federal law,[17] nor was it based on an unreasonable determination of fact. The
15 decision was not "so lacking in justification that there was an error well understood and
16 comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562
17 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on the expert witness
18 instructional error claim, and it should be denied.

19         **E.  Prosecutorial Misconduct**

20         Petitioner asserts that the prosecutor misstated the law to the jury when she argued that
21 that threats to punish the victim for *disclosing* the abuse satisfied the statutory requirement of
22 force, fear, or duress to facilitate the abuse itself. (ECF No. 1 at 98). Respondent argues that this
23 claim is procedurally barred and that the state court's rejection of this claim was reasonable.
24 (ECF No. 11 at 42, 45–46). Petitioner raised this prosecutorial misconduct claim on direct appeal
25 to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned

---

27 [17] Although the California Court of Appeal did not cite to any federal authority on this issue, the pertinent inquiry is
   whether it "reasonably applied the principles contained in relevant Supreme Court precedent." Parker, 665 F.3d at
28 1148 n.1 (citing Early, 537 U.S. at 8). The Supreme Court has noted that a state court is not required to cite or even
   be aware of its cases under § 2254(d). Early, 537 U.S. at 8.

decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's prosecutorial misconduct claim, the California Court of Appeal stated:

### V. Prosecutorial Misconduct
Defendant contends the prosecutor committed misconduct in closing argument to the jury when she stated defendant's abuse of A.C. was accomplished by duress when he told her she would go to jail if she disclosed the abuse. The People argue the issue is forfeited on appeal for defendant's failure to object to the comment and the argument is meritless. We agree with the People's assertions.

#### A. Facts and Proceedings
The prosecutor argued there was no time A.C. had not been forced or had not acted under duress during defendant's abuse, from the very first time defendant touched her and told A.C. she would go to jail if she told anyone. The prosecutor described defendant as a father figure in the home who told A.C. she would go to jail, and from then on, A.C. acted under duress. When defendant simulated hitting A.C. prior to pulling off her pants, she subsequently cooperated out of duress and a fear of force for each of defendant's abusive acts.

Later, the prosecutor described duress as the use of direct or implied threat of force, violence, danger, hardship, or retribution significant enough to cause a reasonable person to submit to something he or she would not normally do. It did not have to include bodily injury. Force would include grabbing a victim and not letting her go. Also, the defendant pretending he was going to hit A.C. could be duress. The prosecutor argued that years of abuse of telling A.C. she would go to jail, of not letting go of her, and of forcing A.C. to engage in sexual acts caused A.C. not to talk about the abuse with others. A.C. always worried about going to jail because that was what defendant said would happen to her, which also made her afraid.

#### B. Forfeiture
When a defendant believes the prosecutor has made remarks during argument that constitute misconduct, he or she is obliged to call them to the trial court's attention by making a timely objection; otherwise no claim is preserved for appeal. (*People v. Clark* (2016) 63 Cal.4th 522, 577 [absence of objection constitutes forfeiture of issue for appellate review]; *People v. Morales* (2001) 25 Cal.4th 34, 43–44.) If a prosecutor misstates the law, a timely objection followed by an advisement by the trial court as to the correct rule of law cures any error because jurors are presumed to follow the trial court's instructions. (*People v. Houston* (2005) 130 Cal.App.4th 279, 312.)

Defendant's counsel failed to object to the comments made by the prosecutor and this issue is not cognizable on appeal. Defendant attempts to evade forfeiture by arguing an objection is not necessary where to do so would have been futile, citing *People v. Alvarado* (2006) 141 Cal.App.4th 1577, 1585–1586. Defendant has failed to plausibly explain why an objection by trial counsel would have been

futile. Furthermore, the court in *Alvarado* dealt with the issue of a prosecutor vouching for the integrity of her office and the victim. Coupled with a weak prosecution case, the challenged comments were too prejudicial to be dispelled with an admonition from the court. (*Ibid*.) The same cannot be said here where the trial court properly instructed the jury on the principles of force and duress. (See *People v. Forrest* (2017) 7 Cal.App.5th 1074, 1082.)

Similarly, defendant's reliance on *People v. Kirkes* (1952) 39 Cal.2d 719, 721–723, is misplaced because there the prosecutor asserted personal knowledge of the defendant's guilt and implied the defendant would not have been prosecuted had the prosecutor not believed in the defendant's guilt. The alleged misconduct here could have easily been cured with an instruction from the trial court. (See *People v. Visciotti* (1992) 2 Cal.4th 1, 80.) In an extreme case where the misconduct was pervasive, defense counsel repeatedly but vainly objected to curb the prosecutor's misconduct, and the courtroom atmosphere was so poisonous that further objection would have been futile, defense attorneys have been excused from having to continually object. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 501–502.) This case does not come remotely close to that extreme. (*Ibid*.)

Defendant further argues his trial counsel's failure to object constituted ineffective assistance of counsel to avoid the forfeiture rule. Because deciding whether to object is inherently a tactical decision, the failure to do so will rarely establish ineffective assistance of counsel. (*People v. Hillhouse*, *supra*, 27 Cal.4th at p. 502.) Where defense counsel's objection would have been overruled, the failure to make a meritless objection does not constitute deficient performance. (*People v. Mitcham* (1992) 1 Cal.4th 1027, 1080.)

Under the federal Constitution, a prosecutor commits misconduct when his or her conduct infects the trial with such unfairness as to make the conviction a denial of due process. (*People v. Clark*, *supra*, 63 Cal.4th at p. 576; *People v. Morales*, *supra*, 25 Cal.4th at p. 44.) Under California law, a prosecutor commits reversible misconduct when he or she uses deceptive or reprehensible methods in attempting to persuade the trial court or the jury, and it is reasonably probable an outcome more favorable to the defendant would have occurred without the misconduct. (*People v. Clark*, *supra*, at pp. 576–577.)

We find defense counsel's tactical choices sound. We further find, on the merits of defendant's claim, there was no misconduct by the prosecutor because she did not misstate the law. Where there is no misconduct, defense counsel is excused from making a futile objection. Defendant has failed to establish his counsel was ineffective *ab initio* because defendant has shown neither deficient performance of counsel nor prejudice. (*Williams v. Taylor*, *supra*, 529 U.S. at pp. 391, 394; *In re Hardy*, *supra*, 41 Cal.4th at p. 1018.)

### C. Duress

"[T]he legal definition of duress is objective in nature and not dependent on the response exhibited by a particular victim." (*People v. Soto* (2011) 51 Cal.4th 229, 246 (*Soto*).) Duress means a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed or, to acquiesce in an act one otherwise would not have submitted. The total circumstances, including the age of the victim, and his or her relationship to the defendant, are factors to be considered in appraising the existence of duress. Other relevant factors including threats to harm the victim, physically controlling the victim when the victim attempts to resist, and warnings to the victim that

revealing the molestation would result in jeopardizing the family. The fact the victim testifies the defendant did not use force or threats does not require a finding of no duress. The victim's testimony must be considered in light of the victim's age and relationship to the defendant. (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13–15, (*Cochran*) [suggesting victim would break up the family if abuse disclosed] disapproved on another ground in *Soto*, *supra*, at p. 248, fn. 12; accord, *People v. Pitmon* (1985) 170 Cal.App.3d 38, 50–51, disapproved on another ground in *Soto*, *supra*, at p. 248, fn. 12; see *People v. Leal* (2004) 33 Cal.4th 999, 1004–1005 (*Leal*) [foregoing definition of duress applies to, inter alia, aggravated sexual assault of child (§ 269), forcible oral copulation (§ 288a, subd. (c)), and forcible lewd and lascivious acts (§ 288, subd. (b)(1)) ].)

Physical control can create duress without constituting force. Duress as used in the Penal Code for sexual abuse would be redundant if its meaning was the same as force, violence, menace, or fear of immediate bodily injury. Duress can arise from different circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. Where the defendant is a family member and the victim is young, the position of dominance and authority of the defendant and his continuous exploitation of the victim is relevant to whether there was duress. Threatening the victim with the breakup of the family through divorce if the abuse is disclosed is sufficient to constitute coercion. (*People v. Senior* (1992) 3 Cal.App.4th 765, 774–775.)

Direct threats of violence, hardship, or retribution are not necessarily required; implied threats may also create duress. (*People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1579.) Conduct such as pushing the victim's head down on the defendant's penis may constitute force (see *People v. Neel* (1993) 19 Cal.App.4th 1784, 1790, disapproved on another ground in *Soto*, *supra*, at 51 Cal.4th p. 248, fn. 12), but physical control can create duress without necessarily also constituting force (*People v. Senior*, *supra*, 3 Cal.App.4th at p. 775; accord, *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005).

Defendant relies on *People v. Bergschneider* (1989) 211 Cal.App.3d 144 (*Bergschneider*), disapproved on other grounds in *People v. Griffin* (2004) 33 Cal.4th 1015, 1027–1028, and *People v. Hecker* (1990) 219 Cal.App.3d 1238 (*Hecker*), disapproved in *Soto*, *supra*, 51 Cal.4th at page 248, footnote 12, as examples where the threat of harm to the victim for not submitting to the abuse was distinguishable from the threat of harm if the victim disclosed the abuse. In both cases, the threat was held not to constitute abuse. In *Bergschneider*, the defendant threatened to " 'kick [the victim's] ass' " if she told anyone about the abuse. This was found not to be a serious threat of physical harm. (*Bergschneider*, *supra*, at pp. 153–154, fn. 8.) In *Hecker*, psychological coercion was found insufficient where the defendant told the victim she would damage his marriage and career if she disclosed the abuse. (*Hecker*, *supra*, at pp. 1250–1251, fn. 7.)

We find the authorities relied on by defendant to be unpersuasive in light of the more recent authorities such as *Soto*, *Leal*, *Senior*, and *Cochran* that focus not on a subtle distinction between warnings enjoining disclosure and those directed to noncompliance. A simple warning to a child not to report molestation reasonably implies the child should not resist or protest the sexual advance. (*People v. Senior*, *supra*, 3 Cal.App.4th at p. 775.) Cases like *Bergschneider* and *Hecker* fail to focus on the difference between force and duress. Duress can involve coercion of a victim with threats to the well-being of the family. *Bergschneider* and *Hecker* further fail to consider the totality of the circumstances involving the power differences between perpetrators and their victims, including size and age

differential. The court in *Cochran* specifically found the holding in *Hecker* overboard, noting that "[t]he very nature of duress is psychological coercion." (*Cochran*, *supra*, 103 Cal.App.4th at p. 15.)

Defendant argues the prosecutor's argument failed to treat a threat to retaliate for disclosure as a relevant circumstance to establish duress but as duress in itself. Defendant likens the prosecutor's statement of law as being equivalent to a prosecutor arguing that flight from the scene of a crime is sufficient to prove guilt rather than only an inference the jury could draw to show guilt. We reject this argument as well as defendant's analogy to flight. As noted in *Senior* and *Cochran*, threats to the stability of the family are sufficient to constitute coercion. On multiple occasions, defendant threatened A.C. with her own criminal prosecution if she disclosed the abuse. Given her young age when the abuse started, and the direct threat defendant's comment made to A.C.'s personal security, there is no doubt defendant's comment was coercive.

Further the People accurately assert that the prosecutor did not rely only on this one form of threat to establish coercion. The prosecutor also argued to the jury that duress was present because defendant physically pulled A.C. during abuse, simulated hitting her, restrained her, and ignore her when she said no. The prosecutor did not misstate the law, nor did she commit misconduct in her closing argument to the jury.

Gomez, 2017 WL 3754320, at *18–21.

1. Procedural Default

Here, the California Court of Appeal found that Petitioner forfeited his prosecutorial misconduct claim by counsel's failure to object to the prosecutor's alleged misstatement of law. This is known as the contemporaneous objection rule. As the California Court of Appeal clearly and expressly stated that its decision rests on a state procedural bar, procedural default is appropriate if the contemporaneous objection rule is independent and adequate.

Respondent asserts that California's contemporaneous objection rule is an adequate and independent state procedural bar. (ECF No. 11 at 45–46). Petitioner has not raised any challenges to the adequacy of California's contemporaneous objection rule and thus, has failed to place the defense in issue. Accordingly, the Court finds that the California Court of Appeal applied an independent and adequate state procedural rule, and Petitioner has procedurally defaulted his prosecutorial misconduct claim. See Rodriguez v. Lizarraga, 740 F. App'x 572, 573 (9th Cir. 2018) ("We have previously recognized that this contemporaneous-objection rule is an adequate and independent state law ground." (citing Paulino v. Castro, 371 F.3d 1083, 1093 (9th Cir. 2004))).

In any case, as set forth below, the Court finds that Petitioner's prosecutorial misconduct claim is without merit. See Apelt, 878 F.3d at 825 ("[W]hen a state court 'double-barrels' its decision—holding that a claim was procedurally barred and denying the claim on its merits— both its procedural default ruling and its merits ruling are entitled to deferential review by federal courts, as intended by AEDPA.").

　　　2. Merits Analysis

The clearly established federal law governing this issue is Darden v. Wainwright, 477 U.S. 168 (1986), which held that a prosecutor's improper comments violate the Constitution if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id. at 181 (internal quotation marks omitted) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). Accord Parker v. Matthews, 567 U.S. 37, 45 (2012). As "the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power,'" it "is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden, 477 U.S. at 181 (citations omitted). "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982).

　　　During closing argument, the prosecutor stated:

> There wasn't a time when she wasn't acting under duress. From the very first time he touched her, she remembers him saying if you tell anyone, you will go to jail.

> From that very first act on, this father figure in the house, the male figure telling her if you tell anyone about this, you're gonna go to jail, she never acted under anything but duress . . . .

(3 RT 280). In her rebuttal closing, the prosecutor stated: "Duress, you're going to go to jail if you tell someone." (3 RT 301).

　　　Petitioner argues that the prosecutor misstated the law. (ECF No. 1 at 98). The California Court of Appeal, however, found that the prosecutor did not misstate the law regarding duress as used in the California Penal Code for sexual abuse. Gomez, 2017 WL 3754320, at *19–21. This determination is binding on this Court. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) ("[A]

state court's interpretation of state law . . . binds a federal court sitting in habeas corpus."). As the prosecutor's comments were a correct statement of the law, Petitioner cannot establish that said comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181.

Based on the foregoing, the Court finds that the state court's denial of Petitioner's prosecutorial misconduct claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on the prosecutorial misconduct claim, and it should be denied.

## F. Discharge of Counsel

Petitioner asserts that the trial court erred in not granting Petitioner's request to discharge his retained attorney, which was raised during defense counsel's closing argument, until after the jury returned its verdict. (ECF No. 1 at 107). Respondent argues that the state court's rejection of this claim was reasonable. (ECF No. 11 at 47). Petitioner raised the discharge of counsel claim on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned decision. The California Supreme Court summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Brumfield, 135 S. Ct. at 2276; Ylst, 501 U.S. at 806.

In denying Petitioner's discharge of counsel claim, the California Court of Appeal stated:

**VII. Defendant's Request to Discharge His Counsel**
At the end of the trial, defendant requested the trial court discharge his retained counsel. Defendant contends the trial court applied the incorrect standard in *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*) reserved for appointed counsel. There was no error.

  **A. Discharge Request**
The trial court took a recess after the prosecutor finished her closing argument. Defense counsel began his closing argument after the recess. Right after counsel began his argument, defendant told the translator he wanted to speak to the court. The trial court excused the jury and conducted a brief hearing. Defendant told the

46

court he wanted to fire his attorney. When asked why, defendant replied his attorney had not helped him, he had lied to him, and he would tell him one thing one day and another thing a different day. The court said it would conduct a *Marsden* hearing after the case was submitted to the jury.

After defense counsel finished his closing argument to the jury, the court conducted what it called a *Marsden* hearing. The court asked defendant why his lawyer had not helped him. Defendant replied counsel had not helped him in anything and had lied to him. Defendant asserted counsel failed to "take away" the force allegation and only visited defendant once in the past year. Defendant said counsel mentioned a plea bargain for between 10 and 20 years, but later denied mentioning this offer to defendant.

During trial testimony, defendant gave counsel questions to ask three of the witnesses, including A.C., but counsel did not ask any of defendant's questions. Defendant said he had a right to fire his attorney and wanted to do so then. When the court asked defendant if he intended to hire a new attorney, defendant replied, "For now, no."

Defense counsel explained he used an interpreter every time he talked to defendant. Counsel said he never told defendant he could take the issue of force out of the picture, but it would be a point in his argument. Counsel said he met with defendant on numerous occasions and went over defendant's statement in detail. Counsel explained defendant apparently misunderstood the People's pending plea offer, which stood at 32 years. Counsel told defendant he would try to negotiate a term of 10 to 20 years. Counsel reviewed the questions defendant wanted him to ask the witnesses, but determined the questions would not engender any sympathy by the jury for him, they were not relevant to the issues in the case, and, as a trial tactic, counsel did not think the questions would help defendant's case.

Defendant further complained that "[m]any times [he] was forced to extend the time" to trial. Defendant said his trial counsel was going to hire a nurse, but then he told defendant during trial that he did not need one. The court explained to defendant that because the prosecutor did not call a nurse, the defense did not need to call one to counteract testimony that was never given.

Defendant reiterated his desire to fire his attorney. The court found defendant had no credibility and was untruthful based on his testimony during the pretrial suppression motion. The court found the evidence of defendant's involvement in sexual conduct was overwhelming. The court further found: "It appears to the court that the defendant is doing everything he can to create error in the record so that he won't face the consequences of his criminal conduct." The court told defendant his counsel would remain attorney of record through the verdict and after the verdict was returned, defendant could fire his attorney at that time. The court told defendant he could hire a new attorney or the court would appoint the public defender to represent him.

After the jury returned its verdicts, the court asked defendant if he still wanted to discharge his counsel. Defendant replied affirmatively. The court explained to defendant that if he wanted his attorney to remain, he could; otherwise, defendant could fire him. The court noted the defense attorney had done a good job representing his client. When the court asked defendant if he was keeping his attorney, defendant replied he did not want anyone. The court asked defendant if he wanted to represent himself and he said, "No." When asked if he wanted his

attorney or the public defender to represent him, defendant responded, "Public Defender." The court relieved defendant's retained counsel and appointed the public defender's office to represent defendant.

### B. Analysis

The right to retained counsel is guaranteed under the Sixth Amendment to the federal Constitution, subject to certain limitations. In California, this right reflects not only a defendant's choice of a particular attorney, but also his or her decision to discharge an attorney hired by the defendant but whom he or she no longer wishes to retain. (*People v. O'Malley* (2016) 62 Cal.4th 944, 1004 (*O'Malley*); *People v. Verdugo* (2010) 50 Cal.4th 263, 310–311 (*Verdugo*).) To discharge retained counsel, the defendant need not demonstrate either that counsel was providing inadequate representation, or that the defendant and counsel are embroiled in irreconcilable conflict. That standard is applicable when a defendant seeks substitution of appointed counsel pursuant to *Marsden*. Consistent with the Sixth Amendment right to counsel, retained counsel may be discharged by the defendant with or without cause. (*O'Malley*, *supra*, at p. 1004; *People v. Ortiz* (1990) 51 Cal.3d 975, 983 (*Ortiz*).)

The right to retained counsel is not absolute. The trial court has discretion to deny the motion if discharge will result in significant prejudice to the defendant or if it is untimely, resulting in disruption of the orderly processes of justice. (*O'Malley*, *supra*, 62 Cal.4th at p. 1004; *Verdugo*, *supra*, 50 Cal.4th at p. 311.) While a defendant seeking to discharge his or her retained attorney is not required to demonstrate inadequate representation or an irreconcilable conflict, the trial court can properly consider the absence of such circumstances in deciding whether discharging counsel will result in disruption of the orderly processes of justice. (*O'Malley*, *supra*, at p. 1004; *People v. Maciel* (2013) 57 Cal.4th 482, 513 (*Maciel*).) Even where the trial court incorrectly refers to the discharge hearing as a *Marsden* hearing, there is no error if the trial court has considered proper matters in the discharge of retained counsel, such as the timeliness of the motion and whether it will result in the disruption of the orderly processes of justice. (*Maciel*, *supra*, at p. 513.)

Defendant argues that when he initially made his motion, the court should have questioned him more carefully concerning whether he wanted to represent himself pursuant to *Faretta v. California* (1975) 422 U.S. 806. Defendant also argues the trial court misunderstood discharging retained counsel was not done according to the *Marsden* standard, and the trial court's only consideration was efficiency of the proceedings. As for defendant's *Faretta* argument, he did not request or in any way indicate he wanted to represent himself. At the hearing conducted after defense counsel completed his closing argument, defendant clearly stated he did not want to represent himself.

Although the trial court referred to *Marsden* when defendant initially made his motion and then during the hearing to discharge counsel, and the court also referred to defense counsel's competency during the discharge hearing, the court expressly stated at both stages it understood defendant's right to fire his attorney. The trial court refused to allow defendant to discharge counsel in the middle of counsel's closing argument to the jury. After conducting the discharge hearing, the court specifically queried defendant concerning whether he wanted to represent himself, to retain new counsel, or to have a court-appointed attorney. The trial court was undeniably aware of defendant's right to fire his attorney and allowed defendant to do so after the jury rendered its verdicts. The trial court's reference to matters covered during *Marsden* hearings is relevant and permissible,

especially where the defendant himself has raised these points. (*O'Malley*, *supra*, 62 Cal.4th at p. 1004; *Maciel*, *supra*, 57 Cal.4th at pp. 513–514.)

Contrary to defendant's argument on appeal, the timeliness of a motion to discharge counsel and its potential disruption on court processes is specifically a proper consideration noted by the California Supreme Court in *O'Malley*, *Maciel*, *Verdugo*, and *Ortiz*. The motion to dismiss counsel in *Maciel* occurred on the eve of trial in a case that had been pending for two years. The codefendants were concerned about further delay. (*Maciel*, *supra*, 57 Cal.4th at pp. 512–513.) The trial court properly considered the delay in the orderly processes of justice in denying the defendant's motion to discharge his retained counsel. (*Id*. at p. 513.)

Here, defendant made his initial motion at the beginning of and in the middle of his counsel's closing argument to the jury. This was both untimely and disruptive of the trial process. The trial court described this tactic as one to create error in the record so defendant would not face the consequences of his criminal conduct. The record fully supports the trial court's observation. The trial court here granted defendant's motion to discharge his counsel and appointed the public defender to represent defendant in further proceedings, after allowing defense counsel the opportunity to finish his closing argument and for the jury to complete its deliberations.[18] The trial court committed no error in delaying defendant's motion to dismiss his attorney.

Gomez, 2017 WL 3754320, at *21–23 (footnote in original).

The Supreme Court has recognized that an element of the Sixth Amendment right to counsel "is the right of a defendant who does not require appointed counsel to choose who will represent him." United States v. Gonzalez-Lopez, 548 U.S. 140, 144 (2006) (citing Wheat v. United States, 486 U.S. 153, 159 (1988)). "To be sure, the right to counsel of choice 'is circumscribed in several important respects.'" Gonzalez-Lopez, 548 U.S. at 144 (quoting Wheat, 486 U.S. at 159). For example, the Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness, and against the demands of its calendar." Gonzalez-Lopez, 548 U.S. at 152 (citing Wheat, 486 U.S. at 159–60; and Morris v. Slappy, 461 U.S. 1, 11–12 (1983)).

In the context of the instant petition, "the Sixth Amendment right to counsel of choice means . . . a right to discharge retained counsel." United States v. Brown, 785 F.3d 1337, 1344

---

[18] Defendant argues his case is similar to *People v. Lara* (2001) 86 Cal.App.4th 139, a case where the trial court incorrectly applied *Marsden* to a case involving retained counsel rather than following the standard set forth in *Ortiz*. (*People v. Lara*, *supra*, at pp. 164–166.) We held in *Lara* that a court unaware of its discretionary powers cannot exercise informed discretion. (*Id*. at pp. 165–166.) Unlike the trial court in *Lara*, however, the trial court here was well aware of its discretion to allow the defendant to discharge his attorney and granted his motion, though not when it was initially made.

(9th Cir. 2015) (citing <u>United States v. Rivera-Corona</u>, 618 F.3d 976, 980 (9th Cir. 2010)). "Unless the substitution would cause significant delay or inefficiency or run afoul of the other considerations we have mentioned, a defendant can fire his retained *or* appointed lawyer and retain a new attorney for any reason or no reason." <u>Rivera-Corona</u>, 618 F.3d at 979–80. "Only affirmative interference with the 'fair, efficient and orderly administration of justice' could have justified an order that [the defendant] could *not* discharge his [retained] lawyer." <u>Brown</u>, 785 F.3d at 1348 (quoting <u>Rivera-Corona</u>, 618 F.3d at 979).

Here, Petitioner's request to discharge his retained attorney occurred right as defense counsel began his closing argument. (3 RT 286). The judge excused the jury and conducted a brief hearing in which Petitioner explained he wanted to fire his attorney because "he hasn't helped me at all," "[h]e has lied to me the entire time," and "[o]ne day he tells me one thing, another day he tells me another." (3 RT 287). The trial court denied the request but indicated that a full hearing on the issue would be conducted once the case was submitted to the jury. (3 RT 287). After defense counsel resumed his closing argument, the judge interrupted to state on the record that Petitioner had his hand up. The trial court informed Petitioner, "I'll take up your issues once your lawyer's through with his statement. Anything else you want to say, I'll let you say." (3 RT 298).

Once the case was submitted to the jury, a full hearing on the attorney discharge issue was conducted and Petitioner's request was denied. (2 CT 331). After the verdict was returned that same day, the trial court asked whether Petitioner still desired to discharge his counsel. Petitioner replied, "I wanted to fire him before they—how am I gonna fire him now that I was sentenced?" (3 RT 327). In response, the trial court stated:

> Well, you haven't been sentenced yet, sir. We're in the middle of trial. Your attorney's giving his closing argument, for the first time you want to fire him. I told you I would entertain that once we finish the day.
>
> If you'd like for him to stay on, I will order that. If you want to fire him, you can discharge him at this time. What do you want to do, sir?
>
> While you're thinking about this, I'll put this on the record.
>
> Obviously, the defendant was aware of the nature of the case, the fact that the victim—she's no longer an alleged victim, the fact that the victim testified that he

had committed these crimes upon her. The defendant's confession was played in court.

The defendant, obviously seeing that his case presented itself in a very poor light, now wants to fire his lawyer. The court finds this all a ruse on the defendant's part in an attempt to somehow create some error on the record.

(3 RT 327–28).

In this case, Petitioner initially moved to discharge his attorney at the outset of counsel's closing argument. Petitioner subsequently interrupted counsel's closing argument in what appears to be an attempt to discuss the issue again despite the trial court indicating that a hearing would be held after the case was submitted to the jury. The California Court of Appeal's determination that Petitioner's request was "untimely and disruptive of the trial process" was not unreasonable. See Brown, 785 F.3d at 1348 ("Only affirmative interference with the 'fair, efficient and orderly administration of justice' could have justified an order that [the defendant] could *not* discharge his lawyer." (quoting Rivera-Corona, 618 F.3d at 979)).

Based on the foregoing, the Court finds that the state court's denial of Petitioner's discharge of counsel claim was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief on the discharge of counsel claim, and it should be denied.

## V.

## RECOMMENDATION

Accordingly, the undersigned HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **January 28, 2019**

UNITED STATES MAGISTRATE JUDGE